**Vincent McCANN, Plaintiff,**

v.

**Roger PHILLIPS, Sheriff, and Dean Traverse, Lieutenant, Defendants.**

**No. 87 Civ. 0913 (LAK).**

United States District Court, S.D. New York.

Sept. 23, 1994.

---

George Tsougarakis, Jodi Edelson, Hughes Hubbard & Reed, New York City, for plaintiff.

M. Kevin Coffey, Goshen, NY, for defendants.

## OPINION

KAPLAN, District Judge.

This action is brought pursuant to 42 U.S.C. § 1983 by a former inmate at the Orange County Correctional Facility ("OCCF") who claims that he was placed in "keeplock" for twenty-four hours in violation of his right to due process of law under the Fourteenth Amendment. Plaintiff asserts that keeplock was imposed for punitive reasons, that this motivation triggered a right to an adversary hearing under *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 and that no such hearing was held. Even if the keeplock was administrative rather than punitive, plaintiff contends that he was not given an opportunity to make a statement to the responsible official and that this violated his rights under *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

This is the Court's decision following a bench trial.

The case arises out of an incident that occurred on November 13, 1986 in K tier, a section of the OCCF then used to house inmates with mental health needs (Traverse 32:25–33:3).[1] The plaintiff, Vincent McCann, who was on an unspecified medication and undergoing alcohol detoxification (McCann 7:17–23), then was incarcerated in K tier pending trial on unspecified charges. The defendants are Roger Phillips, Sheriff of Orange County, and Dean Traverse, a lieutenant at OCCF at the time of the incident in question and now a sergeant with the Orange County Sheriff's Department.

### The Events of November 13, 1986

On November 13, 1986, ten inmates were assigned to K tier including McCann and one Luis Baron. Baron occupied cell K–1 and McCann the adjacent cell, K–2. (PX 11) The entire tier was quite small, with a corridor about four feet wide and perhaps sixty feet long outside the ten cells. (*See* McCann 10:22–24, 19:9–10)

Between 11:50 a.m. and 12 noon on November 13, 1986 a number of inmates were outside their cells, "milling around" or watching television, when inmate Baron began screaming for an officer. Correction Officer ("CO") O'Hara came to his cell. Baron told O'Hara that someone had thrown "piss" on him. According to McCann, Baron "wouldn't quiet down." (McCann 10:5–11:4) At 12:05 p.m., CO Ballard relieved CO O'Hara. (PX 8 at 226–227) Ballard almost immediately called Corporal Varden and reported that inmates on K tier had been throwing water and were abusing inmate Baron.

Lieutenant Traverse was notified of the incident,[2] and Traverse and CO Diamond went to K tier. (Traverse 32:12–24) Upon arriving, Traverse learned that Baron had been locked in cell K–1 at his own request for his own protection. (*Id.* 33:8–10) Traverse inspected Baron's cell and found that Baron's belongings were saturated with liquid. (*Id.* 33:14–20)

Traverse then spoke to other inmates present in an effort to find out what had happened, but none told him what had transpired. (*Id.* 34:13–35:2) In consequence, Traverse, after conferring with Captain Riccardi, directed that McCann and five other inmates be placed in "keeplock"—locked in their cells—for twenty-four hours save for a one hour recreation period. (*Id.* 35:3–36:13)

1. References in this form indicate the name of the witness followed by the page and line numbers of the trial transcript.

2. CO Ballard's contemporaneous report states that plaintiff McCann and five other named inmates "apparently participated" in throwing liquid at Baron. There is no evidence that Ballard identified any suspected perpetrators to Corporal Varden, much less that any individual was identified to Traverse. (PX 6, PX 5)

Thus, all those present who were not already in keeplock were placed in that status.[3]

At virtually the same time, CO Ballard issued notifications of violations of rules of conduct ("Infraction Notices") to McCann (PX 1; McCann 24:11–15) and at least three other inmates, David Montanya, Edward Van Amburgh and Rufus Gibbs. (Ans.Exhs. 2–3, PX 13 (attachments); PX 4) Each of the Infraction Notices, which are printed forms with handwritten completions, stated in part:

"You are accused of an act of misconduct as indicated below by the person(s) signed as the accuser(s). You may be confined to your cell for a period of 24 hours. The Ombudsman will investigate the allegation."

The specific alleged conduct written into each of the printed forms stated: "Residents on 'K' side were throwing liquid at resident Baron (K–1)." (*Id.*) This was said to constitute "conduct disrupting orderly running of facility" (*id.*), a violation of the OCCF rules (PX 2 at 15–16).

Although there was no evidence of any disorder or rowdiness in the 11:30 a.m. to 12:30 p.m. period, beyond the fact that water had been thrown on Baron, (McCann 10:18–11:17) there was evidence of recent prior thefts and fights on K tier (Traverse 34:13–18, 60:3–61:9, 61:19–62:16), and the log for the day in question indicates that the atmosphere was not calm.[4] Lieutenant Traverse testified that he imposed keeplock in this case because K tier was the mental health unit, it was occupied by inmates in various states of mental treatment, "things were getting a little out of hand," and all of the inmates in the tier were entitled to protection. (Traverse 38:12–20, 46:5–22, 48:5–12) Traverse said that his decision was the result of a cumulation of these factors. (Traverse 46:16–22) Traverse's contemporaneous report, however, stated:

"This [keeplock order] is based on the fact that although they were not all throwing water, etc. on inmate Baron, none took any action to prevent or terminate this behavior." (PX 5)

I find that Lieutenant Traverse was motivated by a desire to reassert control over K tier in light of the Baron and previous incidents to which he alluded at trial. I·find further that he thought, given the lack of any evidence of which of the inmates was responsible for the Baron incident, that charging all those possibly responsible and holding them for up to 24 hours pending further inquiry was an appropriate means to that end. I find also, however, that he intended in part to punish the K tier inmates for failing to prevent or terminate the Baron incident. Hence, his motives, in the parlance of the cases, were both administrative and punitive.

In seeking to show a purely punitive motive, plaintiff claimed that inmate Ault, shortly after keeplock was imposed, confessed to having doused inmate Baron, but that Lieutenant Traverse nonetheless insisted that plaintiff and the others remain in keeplock.

McCann testified that soon after he and the other inmates on K tier were locked in

---

**3.** There was an issue at trial as to whether all inmates on K tier at the time of the incident were placed in keeplock, as Lieutenant Traverse testified and as a contemporaneous report suggests (PX 5), or whether plaintiff and certain others were singled out.

The census in K tier, as noted, was ten. (PX 11) Six inmates were placed in keeplock as a result of this incident. (PX 8 at 227; PX 7C, Int. No. 1A) Inmate Baron had been placed in keeplock for his own protection before Traverse arrived in K tier. (PX 8 at 225; Traverse 33:8–10) Inmate Morales already was in keeplock for other reasons. (PX 8 at 225; PX 6) Inmate Porto was locked in for his own protection and was under suicide watch. (PX 8 at 225) The only inmate not accounted for on the documentary record was Philip Williams.

Lieutenant Traverse testified that anyone on the census who was not keeplocked may not have been present at the time of the incident (Traverse 48:25–49:2; 50:4–9), and plaintiff offered no contrary evidence. I find that Traverse ordered keeplock for all residents present in K tier who were not in keeplock already.

**4.** The log book for K and L tiers for that date indicates that at the start of the 7 a.m. shift, the officer who then came on duty noted among other things that none of the residents was to have matches or shoe laces, that any inmate wishing to shave was to do so across from the sergeant's office, that three inmates were locked in for their own protection, and that one of the inmates, a K tier resident, was to be watched closely because he "may [have been] suicidal." (PX 8 at 225)

and given Infraction Notices, he heard Ault tell CO Ballard that Ault had thrown water on Baron and that Ault did not want the others to suffer for what he had done. (McCann 12:7–14:19, 24:11–24) Plaintiff offered as well an unsworn statement of Ault, acknowledged before a notary public,[5] which stated that Ault confessed to the officer on duty that he had thrown the water on Baron, and that he did so about fifteen minutes after everyone had been put in keeplock. (PX 9) According to McCann, Ballard then went to the office at the front of the block. McCann and the other inmates were screaming to be released. Plaintiff testified that he heard Ballard speak to someone on the telephone. Ballard returned and, according to McCann, stated that Lieutenant Traverse, when told of Ault's statement, said "Fuck them. Keep them locked in anyway." (McCann 15:23–18:11)[6] Traverse denied ever having been told that inmate Ault admitted throwing the liquid on inmate Baron. (Traverse 39:9–13) CO Ballard, whose current whereabouts apparently are unknown to either side, did not testify.[7]

In view of McCann's testimony and a roughly contemporaneous corroborating note in OCCF records, I find that Ault at some time on November 13 or 14 took responsibility for throwing water on Baron.[8] I find also that Lieutenant Traverse was informed, prior to the end of the keeplock period, of Ault's statement, and I credit McCann's account of CO Ballard's alleged report of his supposed telephone conversation with Traverse.

The effect of the keeplock order was that McCann was kept in his cell for twenty-four hours except for a one hour recreation period. (McCann 9:2–22) He was not, during that period, permitted television, shower or telephone privileges or the limited freedom of movement usually accorded inmates. (*Id.*) As he would have been locked in between 11 p.m. and 7 a.m. in any event (Traverse 37:14–18), he was confined to his cell for fifteen additional hours.

At no time during the keeplock period was McCann given an opportunity to make any statement to Traverse concerning the keeplock order. (McCann 20:20–22)

*Post–Keeplock Events*

McCann was released from keeplock at the end of the twenty-four hour period. He never was given a hearing on the accusation of misconduct contained in the Infraction Notice. (McCann 20:9–19) It is undisputed, however, that no further sanctions were imposed upon him.

*OCCF Policies and Procedures*

During the period in question, it was common practice in the OCCF to impose twenty-four hour keeplock on inmates charged with rule violations. The inmate was given an Infraction Notice, which was sent to the Om-

---

5. Plaintiff's counsel mistakenly characterized the statement as sworn (Tr. 14:22, 15:9), evidently assuming that an acknowledged statement is verified with respect to the content of the statement rather than merely a sworn statement as to the genuineness of the signature on the document. *See* Black's Law Dictionary 39 (4th ed. 1951).

6. The transcript does not accurately report McCann's answer at page 18, lines 10–11. The testimony was that quoted in the text.

7. McCann's account of Ballard's alleged statement, and the Ault statement, were received over hearsay objection, subject to reserved motions to strike. The Ault statement is hearsay and probably should not be received under Fed.R.Ev. 803(24) and 804(5). Ballard's statement to McCann is admissible under Fed.R.Ev. 801(d)(2)(D) insofar as it is offered against defendants in their official capacities. Whether it is admissible against defendants in their individual capacities depends upon whether the fact that Phillips and Traverse are sued in their individual capacities warrants a different result even though Ballard was below them in the official chain of command at OCCF. *Zaken v. Boerer*, 964 F.2d 1319 (2d Cir.1992), does indicate that Ballard's statement should probably be admitted. That case held that a vice president's statement was admissible against the owner of the company in her individual capacity because, though employed by the company, the vice president was functionally the agent of the owner. *Id.* at 1322, citing *United States v. Paxson*, 861 F.2d 730, 734 (D.C.Cir.1988); *United States v. Young*, 736 F.2d 565, 567 (10th Cir.1983). Given my resolution of the individual capacity claims, however, extended analysis of this question is unwarranted. I deny the motions to strike in all respects.

8. There is a note by an unidentified author on the notification of charges to inmate Grubb that indicates that Grubb told some OCCF official on November 14, the following day, that Ault had admitted throwing water on Baron. (PX 4)

budsman for further action, if any. (Traverse 36:2–13, 40:8–41:2, 41:25–42:19, 59:19–25) The Ombudsman typically decided after the twenty-four hour period whether to hold a disciplinary hearing in the matter. (*Id.*) In doing so, the Ombudsman sometimes spoke to the inmate in question and perhaps others. (*Id.* and 56:15–57:16; *see also id.* 54:12–56:8)

The OCCF Rules and Regulations (the "OCCF Rules") described in some detail the procedures for dealing with disciplinary charges involving inmates. They stated:

"If your alleged commission of a facility infraction is deemed to be a threat to life, safety, health, security of the facility or a substantial amount of property, you will be confined to your cell for a maximum of twenty-four hours until the Ombudsman or Adjustment Committee has a hearing on the alleged misconduct. This committee is comprised of persons who have no previous knowledge of the act, and will be persons other than [OCCF] personnel, or residents of the facility. You will be notified, in writing, that you will be given a hearing by this committee and the reasons for your confinement." (PX 2 at 17)

The OCCF Rules went on to provide that the inmate would be given at least twenty-four hours notice of a disciplinary hearing before the Ombudsman and specified the procedural rights of the inmate "with respect to an Ombudsman or Adjustment Committee hearing on [the] charges." (*Id.* at 17–18) "Hearing" in this context meant a trial-type procedure including confrontation and cross-examination. (*Id.*) Both the Ombudsman and the Adjustment Committee were given broad discretion, ranging from dismissal to imposition of a major penalty, as to the disposition of the charges. (*Id.* at 18)

While the OCCF Rules might be construed to have required that a hearing of some type on the alleged infraction be held during the keeplock period, and thus within twenty-four hours (*see id.* 17, 20 ¶ 11), I find that the usual practice did not include any hearing or other review within the twenty-four hour period. Nor did the OCCF Rules or the prevalent practice provide for an inmate subjected to keeplock to make a statement to the officer responsible for his confinement.

McCann sought to show also that no hearings on disciplinary charges against inmates ever were held, arguing that this supported his contention that twenty-four hour keeplocks in reality were routine punishments for rule violations and therefore entirely punitive in nature. I am satisfied that Traverse's keeplock order in this instance, which is the only occasion at issue,[9] had a proper administrative basis and motive given the situation he found on November 13, 1986. Hence, I need not explore the somewhat troubling indications as to the general practices at OCCF. I simply note that the evidence plaintiff adduced was not sufficient to persuade me that the disciplinary mechanism described by Traverse and detailed in the OCCF Rules and the pertinent State regulations was a sham.[10] These matters were not

---

**9.** Plaintiff offered evidence also that he was given another Infraction Notice and subjected to twenty-four hour keeplock in February 1987 and that no hearing was held on the alleged rule violation in that instance as well. Inasmuch as plaintiff did not seek relief with respect to that incident in his complaint or, far more importantly in view of the *pro se* nature of the complaint, in counsel's opening and closing argument or in any amended pleading after counsel appeared on his behalf, I need not address that issue. The incident is relevant insofar as it might bear out plaintiff's claim that disciplinary hearings never were held on alleged rule violations but, for the reasons expressed in the text and in footnote 10, that issue is not material here and, in any case, I am not persuaded by plaintiff's proof.

**10.** PX 7A, Int. No. 7, stated that it was routine practice to impose keeplock for twenty-four

hours on inmates charged with rule violations "without further prociding(s) [sic]." Plaintiff asserted that this answer was an admission that no proceedings beyond the keeplock order ever took place with respect to alleged rule violations. But the evidence showed that at least two of the Infraction Notices issued on November 13, 1986 were resolved by subsequent action of the OCCF Ombudsman. (PX 13, Ans. Exs. 2–3; *see also* McCann 21:16–22:2) Hence, I construe the interrogatory answer to refer to further proceedings with respect to keeplock orders rather than to acknowledge that no further proceedings ever were held concerning alleged rule violations.

I similarly am unpersuaded by other interrogatory answers, which established that 105 inmates were placed in keeplock status of one type or another during January and February 1987 (PX 7A Int. No. 16 & n. *), that none of those who

pursued in sufficient depth to warrant factual findings adverse to the defendants even if such findings would be material here, which they would not.

### Discussion

The first task is to determine exactly what McCann is claiming.

This began as a *pro se* action in which McCann alleged deprivation of his due process rights in very general terms. A motion to dismiss or, alternatively, for summary judgment dismissing the complaint was litigated by McCann *pro se* and denied by Judge Kram upon the report and recommendation of Magistrate Judge Dolinger, both of whom quite properly construed McCann's allegations in very broad terms. (Docket items nos. 44 at 9 and 47 at 2–3)

McCann was represented at trial by able counsel. His trial memorandum made a single claim—that the imposition of the twenty-four hour keeplock on November 13, 1986 without a hearing or "any procedural due process protections" was unconstitutional.[11] Counsel's opening statement reiterated that McCann's claim was one of procedural due process with respect to the imposition of keeplock, although counsel said that the alleged due process violation was the lack of a post-confinement rather than a preconfinement hearing. (Tr. 2:16–4:13) In closing

argument, however, plaintiff's counsel seemed to shift ground. He acknowledged that there was no right even to an immediate post-confinement hearing, arguing that McCann nonetheless had been entitled to a hearing on the allegations in the Infraction Notice *after* he was released from keeplock.[12]

Counsel's statements in closing argument might well justify the Court in concluding that McCann abandoned any claim that the twenty-four hour keeplock was procedurally defective and has limited his claim to the lack of a hearing on the charge in the Infraction Notice. Given some possible ambiguity in those statements, and in the interests of substantial justice, however, I will deal with the merits of the claim articulated in plaintiff's trial memorandum and opening statement.

### Imposition of Keeplock

### Liberty Interests

■ Prison officials have broad discretion in running their facilities, and the range of protected liberty interests of incarcerated persons is quite narrow. *E.g., Hewitt,* 459 U.S. 460, 103 S.Ct. 864. The Due Process Clause does not itself subject prison authorities to judicial oversight as long as the conditions or degree of confinement they impose are within an inmate's sentence and do not

received keeplock status during that period "received any type of hearing and or prociding(s) [*sic*] other than the infraction report ..." (*id.* Int. No. 18), and that no formal or informal hearings were held during that period in regard to any infraction write ups (*id.* Int. No. 17). There are too many gaps in this evidence for it to be persuasive. First, as the record in this case showed, inmates were placed in keeplock both pending proceedings on Infraction Notices and for other reasons that would not even arguably call for any hearing, e.g., at their own request. There is no evidence of how many of the 105 were in connection with Infraction Notices. Second, the interrogatory answers state also that there was no Ombudsman available in the OCCF during the two months which were the subject of the questions, which might explain the lack of any hearings at that time. (*Id.* Int. Nos. 17–18) Finally, the time period covered by the interrogatory answers postdated the incident involving plaintiff that is at issue here.

11. Plaintiff's trial memorandum, Aug. 31, 1994 ("Pl.Mem."), at 1–2.

12. In response to the Court's question as to how a post-confinement hearing would have made a difference to the plaintiff, the following colloquy took place:

"MR. TSOUGARAKIS: We do not contend it would have made a difference for his keeplock. That was going to be imposed 24 hours regardless. We don't argue or seek there should have been a preconfinement hearing or even an immediate hearing.

"THE COURT: You're not contending that the keeplock was wrongful in and of itself?

"MR. TSOUGARAKIS: We are not contending that at all, your Honor.

"THE COURT: So you are basing the case solely on the proposition that Mr. McCann was damaged by what you say to have been an unconstitutional deprivation of a hearing a week after he was out of keeplock.

"MR. TSOUGARAKIS: That's right...." (Tr. 64:22–65:10; *see also id.* 67:22–68:11)

otherwise violate the Constitution. *Id.* at 468, 103 S.Ct. at 869–70. Hence, McCann's right to procedural due process in connection with the imposition of keeplock turns, in the first instance, on whether any protected liberty interest was created by New York law. *Sher v. Coughlin,* 739 F.2d 77, 80–81 (2d Cir.1984); *see Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994). This in turn depends on whether "state statutes or regulations place[d] substantive limitations on the discretion of the relevant decisionmaker to place an inmate in restrictive confinement ..." *Deane v. Dunbar,* 777 F.2d 871, 875 (2d Cir. 1985).

*Applicable Rules, Regulations and Statutes*

As I have found that the imposition of the keeplock was the result of both administrative and punitive motives, it is useful at the outset to consider separately the extent to which state law restricts imposition of restrictive confinement for these respective purposes.

[redacted] *Administrative.* There are two relevant sources pertinent to the circumstances in which officials of the OCCF were free to impose keeplock or other forms of restrictive confinement for administrative reasons: the OCCF Rules (PX 2) and the regulations the New York State Commission of Correction then in effect.[13]

As indicated above, the OCCF Rules permitted the imposition of keeplock for up to twenty-four hours if an inmate's "alleged commission of a facility infraction is deemed to be a threat to life, safety, health, security of the facility or a substantial amount of property ..." (PX 2 at 17) The Commission of Correction regulations then in effect permitted imposition of keeplock for up to twenty-four hours "if an employee has reasonable grounds to believe that the prisoner represents an immediate danger to himself or other persons or property or constitutes a threat to the safety, security or order of the facility ..." 9 N.Y.C.R.R. § 7006.1(b)(3) (1976).

While one might pause on the question whether the language of the OCCF Rules sufficiently limited the discretion of prison officials in imposing twenty-four hour keeplock to create a liberty interest, the question is academic because the Commission of Correction regulations are more definite and plainly did so. *Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989) (holding that similar language of 7 N.Y.C.R.R. § 251–1.6(a) created protected liberty interest). Hence, McCann had a protected liberty interest with respect to the imposition of twenty-four hour keeplock in connection with the issuance of an Infraction Notice, which is regarded as keeplock imposed for administrative reasons.[14]

[redacted] *Punitive.* The Court of Appeals said in *Sher* that "state statutes and regulations authorizing restrictive confinement as punishment upon a finding of a disciplinary infraction will invariably provide sufficient limitation on the discretion of prison officials to create a liberty interest." 739 F.2d at 81. As the statutes and regulations applicable

13. N.Y.Comp.Codes R. & Regs. tit. 9, § 7006.1 (1976) (repealed, new § 7006.1–7006.11 filed 1992) (hereinafter cited as 9 N.Y.C.R.R. § 7006.1(b)(3) (1976)).

14. *Hewitt,* 459 U.S. at 473–77, 103 S.Ct. at 872–74, treated imposition of restrictive confinement pending a hearing on charges of misconduct as administrative in nature. It noted the important institutional interests in separating an inmate from the general population "until completion" of an investigation of the inmate's alleged misconduct as well as the possible need to prevent such an inmate from attempting to influence the course of an investigation of an incident. Here, neither the OCCF Rules nor the State regulation permitted the keeplock to extend beyond twenty-four hours, at least in the ordinary case. While one might view this difference as suggesting that the twenty-four hour keeplock is punitive, on the theory that it does not fully serve the administrative interests articulated in *Hewitt,* I believe there is sufficient justification in the possible need to have a "cooling off" period following an incident that leads to the filing of institutional charges, and to inquire into the events, to warrant treating the keeplock as administrative absent other evidence requiring a different conclusion. *See id.* at 474, 103 S.Ct. at 872–73 (alluding to possible need to impose restrictive confinement "[i]n the volatile atmosphere of a prison" even if the inmate confined "has committed no misconduct"). *See also Gittens,* 891 F.2d at 40.

here were similar to those at issue in *Sher*,[15] McCann had a protected liberty interest with respect to the imposition of keeplock for punitive reasons.

### The Process Due

■ "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Determining the process that is due requires weighing three factors: (1) the importance of the private interest; (2) the risk of erroneous deprivation through the procedures used and the value of additional safeguards; (3) the government's interest in speedy and efficient process. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). And since the calculus of interests varies depending upon whether a particular confinement is administrative or punitive in character, the cases have reached differing conclusions as to the nature and extent of the process due given the circumstances of a particular confinement.

### Administrative Keeplock

■ While McCann's principal claim is that the keeplock to which he was subjected was entirely punitive in nature, he argues in the alternative that he was deprived of due process of law even if it was purely administrative. Specifically, he argues that he was not notified of his right, or afforded an opportunity, to make a statement to the person responsible for his confinement and thus was deprived of an opportunity to challenge the keeplock.[16] (Pl.Mem. at 8–10) He points out that the Second Circuit held in *Gittens* that the regulation then applicable to State prisons,[17] which was similar to the regulation governing OCCF in November 1986 except that it authorized keeplock for seven days pending a disciplinary hearing,[18] was unconstitutional because it did not "provide for an inmate in keeplock to make any statement to the officer in charge of his confinement." 891 F.2d at 39, 41.

The starting point for analysis is *Hewitt*, 459 U.S. 460, 103 S.Ct. 864. There the inmate was placed in administrative confinement following a prison riot. He was given a misconduct report, which charged him with assaulting officers, on the following day. He was given an opportunity to make a statement as to his version of the facts relating to the misconduct report. Five days after the incident, a hearing committee reviewed the case, continued the inmate in administrative confinement, but reached no conclusion on the misconduct charge. More than a month later, a second misconduct charge was lodged. Several days later, a hearing committee dropped the first misconduct charge without determining guilt, found the inmate guilty of the second, and sentenced him to disciplinary segregation. Thus, the inmate was given (a) notice of the information supporting the confinement, albeit on the day following its institution, and (b) an opportunity to submit a statement in connection with a review several days later. *Id.* at 472, 476–77, 103 S.Ct. at 871–72, 873–74.

The Supreme Court held that this informal, non-adversary review satisfied the Due Process Clause in light of the administrative nature of the segregation. It noted that there were important governmental interests served by the confinement because the in-

---

**15.** *Sher* dealt with a prisoner at the Attica Correctional Facility whose treatment was governed by the New York Correction Law and part 250 of Title 7 of the New York Code of Rules and Regulations. The regulations for disciplinary segregation in 7 N.Y.C.R.R. § 250 (1982) are substantially similar to those in this case, 9 N.Y.C.R.R. § 7006 (1976), because both regulations limit the discretion of prison officials who impose segregation for expressly disciplinary purposes by requiring process to be used before sanctions are imposed to evaluate if the inmate has violated a substantive rule and merits confinement. *Compare* 9 N.Y.C.R.R. § 7006.1(c) (1976) and 7 N.Y.C.R.R. § 253 (1982).

**16.** At one point in his closing argument, plaintiff's counsel suggested that there was no reasonable basis for Traverse to conclude that keeplock was necessary for the security of the facility. (Tr. 70:2–6) This contention was not raised in plaintiff's trial memorandum or the opening statement. In any case, I find that Traverse had a reasonable basis for so concluding.

**17.** 7 N.Y.C.R.R. § 251–2.2 (1988).

**18.** *Compare* 9 N.Y.C.R.R. § 7006.1 (1976).

mate posed a threat to the safety of other inmates and the security of the institution and the confinement protected the institution's ability to investigate his role in the riot. *Id.* at 473, 103 S.Ct. at 872. The officials' ability to make these judgments, the Court said, would not have been assisted materially by an adversary proceeding and were matters "normally left to the discretion of prison administrators." *Id.* at 473–74, 103 S.Ct. at 872, *quoting Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 2400 n. 14, 69 L.Ed.2d 59 (1981). The inmate's private interest, given that he was in an extremely restricted environment to begin with, was insufficient to require more elaborate procedural safeguards in the circumstances.

The balance of interests here is somewhat different from that in *Hewitt,* chiefly in two respects. First, McCann's private interest in avoiding keeplock was less weighty than the interest of the inmate in *Hewitt* because McCann was placed in keeplock for a maximum of twenty-four hours, whereas the confinement in that case was for an indefinite period pending resolution of the misconduct charge, a period that ultimately lasted over a month. Second, the governmental interest here was perhaps less weighty than in *Hewitt* because the OCCF evidently made no effort to keep McCann in confinement pending a hearing on the charge against him. Indeed, it took no formal action to resolve the charge.

The fact that the maximum keeplock period here was only twenty-four hours is significant. While the Second Circuit has held that an inmate subjected to administrative keeplock is entitled to notice of the reasons for the inmate's confinement and an opportunity to make a statement to the responsible official where the period of confinement may be as long as four days,[19] it has not done so with respect to any shorter period. Nonetheless, the essence of the Due Process Clause is the principle that a person deprived of a protected liberty interest receive notice of the reason for, and some opportunity to be heard with respect to, that deprivation. *See, e.g., Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873–74. While the precise timing and nature of the opportunity to be heard will vary with the nature, length, conditions and circumstances of the deprivation, it must occur "at a meaningful time and in a meaningful manner." *Mathews,* 424 U.S. at 333, 96 S.Ct. at 902; *see Lowrance,* 20 F.3d at 536 (delay of review of keeplock until hearing on underlying charge "effectively precludes a challenge to the confinement itself"). The suggestion, advanced by defendants, that McCann's release after twenty-four hours obviated any need for an opportunity to be heard with respect to the keeplock therefore must be rejected, at least in the specific circumstances of this case.[20] Hence, I hold that McCann was entitled at least to notice of the reasons for the keeplock and some meaningful opportunity to be heard with respect thereto.[21] In consequence, I conclude that McCann was deprived of his right to due process of law in that neither the State regulations then governing county jails[22] nor the OCCF Rules

**19.** *Matiyn v. Henderson,* 841 F.2d 31, 36–38 (2d Cir.1988) (holding that an administrative segregation of four days without process violated prisoner's liberty interest, but dismissing complaint because of immunity defense).

**20.** This is not to say, and plaintiff does not argue, that the Constitution requires that the inmate be given an opportunity to make a statement, or even notice, within twenty-four hours in all cases. Nor is it to say that prison officials necessarily would be required to afford an inmate an opportunity to make a statement after a keeplock ended. What is required is reasonable notice and a reasonable opportunity to make a statement; reasonableness will be determined with regard to the attendant circumstances. *Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990); *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 872–83; *Gittens, supra,* 891 F.2d at 41. McCann was not afforded

*any* opportunity to make the requisite statement, and defendants offered *no* justification for not affording that opportunity during the twenty-four hour period. I therefore need not consider for how long that opportunity may be delayed or whether it may be dispensed with if the inmate is released before it reasonably could be afforded.

**21.** As the point was not argued on behalf of the defendants, I have not considered whether this deficiency was cured by the existence of the grievance procedure set forth in the OCCF Rules.

**22.** I note that the position plaintiff takes was adopted by the State with the amendment of the pertinent regulation in 1992 to require precisely the opportunity that plaintiff claims should have been afforded here. 9 N.Y.C.R.R. § 7006.7 (1992).

provided for him to make any statement to the officer in charge of his confinement, Lieutenant Traverse.

## Punitive Keeplock

■ Substantially more exacting procedural safeguards must be afforded where keeplock or other restrictive confinement is imposed purely as a punitive measure, at least where the maximum permissible punishment is as long as fourteen days.[23] Plaintiff's primary argument is that McCann's keeplock was entirely punitive and that he therefore was entitled to greater protection. (Pl.Mem. at 7) I have found, however, that Lieutenant Traverse's motives were both administrative and punitive. Hence, I must determine the standard applicable in such a mixed motive case before addressing plaintiff's contention.

## Traverse's Mixed Motive

*Sher* provides the answer. The case dealt with a transfer from the general population at one prison into restrictive confinement at another. The transfer would have been within the unfettered discretion of prison officials, but the restrictive confinement allegedly violated the inmate's due process rights on the ground that its purpose was to impose punishment and the inmate was not afforded a hearing. The Court said that "action taken on the basis of both valid and invalid motivations is not constitutionally tainted if the action would in any event have been taken on the constitutionally valid ba-

sis." 739 F.2d at 82 (footnote omitted). It held that the restrictive confinement absent procedural safeguards did not violate the inmate's constitutional rights, even if made for punitive reasons, because the administrative reasons "would have caused [prison officials] to transfer [the inmate] and confine him ..., whether or not they also entertained thoughts of imposing some sort of discipline." *Id.*

So too here. Lieutenant Traverse was entitled to place McCann in keeplock for up to twenty-four hours for legitimate administrative reasons, subject to OCCF affording McCann reasonable notice and the opportunity to make a statement to the person in charge of his confinement. Given the circumstances that existed on K tier on the date in question, I find that Traverse would and properly could have imposed the keeplock for administrative reasons even if he had not wished as well to punish McCann and the others for failing to intercede in the Baron incident.[24] McCann was released at the end of twenty-four hours, and no further sanctions were imposed upon him. In consequence, the failure of OCCF to afford McCann the procedural safeguards that allegedly would have been required had Traverse imposed keeplock solely for disciplinary reasons is immaterial, and I have no occasion to reach that question.

Accordingly, I hold that the only constitutional deprivation McCann suffered in connection with the imposition of the keeplock was the fact that he was neither advised of

---

**23.** *E.g., Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *Sher, supra,* 739 F.2d at 81; *Anderson v. Coughlin,* 700 F.2d 37, 46 (1983); *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983).

**24.** McCann maintains that Traverse's insistence on maintaining the keeplock after Ault took responsibility for throwing water on Baron, combined with Traverse's salty and inappropriate comment, proves Traverse's punitive intent. I take it into account in finding that Traverse's motivation was partly punitive. But the administrative purpose of and justification for the keeplock did not evaporate after Traverse learned that inmate Ault took responsibility for throwing water on inmate Baron. The Baron incident was only one in a series of events that Traverse was justified in viewing as having created an unstable environment. This is specifically noted in Tra-

verse's contemporaneous report (PX 5) and corroborated by entries in the log book, which show, among other things, that some inmates were in protective keeplock and no one on K tier was permitted shoelaces or matches, illustrating the tension in the block (PX 8 at 225). Moreover, Traverse was not obliged to conclude immediately from Ault's confession that the others were blameless. Given the Supreme Court's admonition that prison officials are entitled to substantial discretion in making the often intuitive and subjective judgments concerning the existence of threats to institutional security (*Hewitt,* 459 U.S. at 473–74, 103 S.Ct. at 872)—judgments that "draw on more than the specific facts surrounding a particular incident" (*id.* at 474, 103 S.Ct. at 872)—I am unwilling to conclude from Traverse's comment that the *sole* purpose of the keeplock was punitive.

his right, nor given the opportunity, to make a statement to Lieutenant Traverse concerning his confinement.

*Liability of the Defendants*

McCann maintains this action against Sheriff Phillips solely in his official capacity and against Sergeant (formerly Lieutenant) Traverse in both his official and individual capacities. (Tr. 72:5–73:15, 85:19–21)

■ In order to prevail on the official capacity claims, plaintiff must establish that the specific constitutional violation found was the result of a governmental custom or policy. *E.g., Ricciuti v. New York City Transit Authority,* 941 F.2d 119 (2d Cir.1991). Here the evidence established that the fact that McCann was not afforded an opportunity to make a statement to Traverse concerning the keeplock was consistent with the standard policy followed in the OCCF, as set forth in the OCCF Rules and the Infraction Notice form. In consequence, the defendants are liable in their official capacities for any damages attributable to that violation.

■ In order to prevail on his claim against Traverse in Traverse's individual capacity, plaintiff must show that "the defendant [is] responsible for the alleged constitutional deprivation." *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir. 1989). While Traverse gave the order to place McCann in keeplock, that is not what plaintiff complains of, much less the violation I have found. Rather, the deficiency was the failure to advise McCann that he had a right, and to afford him the opportunity, to make a statement to Traverse concerning the keeplock order. The Constitution did not require that Traverse, in particular, notify McCann of his right to make a statement. It did require that Traverse, as the person responsible for the keeplock order, give McCann an opportunity to make a statement to him, which Traverse failed to do.

Holding Traverse personally liable seems unfair because the defect here really was a deficiency in the rules and regulations. But the defendants' inexplicable failure to assert the defense of official immunity, even after Magistrate Judge Dollinger commented on the failure,[25] leaves me no choice.

*Causation and Damages*

■ Compensatory damages in Section 1983 cases are awarded to compensate for actual injury caused by the constitutional deprivation.[26]

Here, plaintiff has not established "but for" causation. Lieutenant Traverse had sufficient cause to impose administrative keeplock and to maintain it after Ault took responsibility for the Baron incident. There is no basis sufficient for me to conclude that the result here would have been any different for McCann if he had been given an opportunity to talk to Traverse about the confinement.

■ Even assuming that a statement by McCann to Lieutenant Traverse would have resulted in McCann being released from keeplock earlier that he was, there is virtually no evidence of actual injury. McCann was confined to his cell, as opposed to being allowed freedom of movement within a four foot by approximately sixty foot area, for an additional fifteen hours. I accept that he was upset during at least part of that period. (McCann 18:24–19:12). But there is no evidence that he became ill, required additional medication, or sought or received attention from any mental health professional or clergy.

In the circumstances, I award plaintiff the sum of $50.[27] I see no purpose in attempting to characterize this as an award of nominal damages in the absence of any actual injury or as an award calculated with reference to actual injury; the result would be the same

---

25. Docket item no. 51, at 10 n. 7.

26. *Carey v. Piphus,* 435 U.S. 247, 263, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978) ("injury caused by a justified deprivation … is not properly compensable under § 1983"; "the denial of procedural due process should be actionable for nominal damages without proof of actual injury"); *McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983); *Patterson v. Coughlin,* 905 F.2d 564, 568 (2d Cir.1990).

27. This is in line with *per diem* awards in analogous cases. *See, e.g., Patterson v. Coughlin* 722 F.Supp. 9, 11 (W.D.N.Y.1992), *aff'd in part and vacated in part,* 905 F.2d 564 (1990) (suggesting $25–$100 as the appropriate range of relief).

in either event. Nor is there any basis for an award of punitive damages.[28]

### Hearing on the Infraction Notice

As noted at the outset, plaintiff's counsel argued in his summation, for the first time, that McCann was deprived of due process because no hearing ever was held on the charge set forth in the Infraction Notice issued on November 13, 1986. While there was no hearing, there was no evidence that any determination ever was made with respect to, or any sanction imposed as a result of, the charge. While plaintiff speculated that the unresolved charge might have remained in McCann's file and affected his good time (Tr. 65:19–66:5), there was no such evidence.[29] In consequence, plaintiff suffered no cognizable injury as a result of the lack of a hearing on the charge set out in the Infraction Notice. I therefore reject his claim.

### Conclusion

Accordingly, plaintiff is awarded judgment in the amount of $50 against both defendants in their official capacities and against Dean Traverse in his individual capacity. The individual capacity claim against Roger Phillips has been dismissed previously. The Clerk shall enter final judgment accordingly. *See* Fed.R.Civ.P. 58.

The foregoing constitutes my findings of fact and conclusions of law.

SO ORDERED.

---

**28.** Given this conclusion, I need not resolve the question whether a New York county sheriff is subject to punitive damages under 42 U.S.C. § 1983 in his or her official capacity. Municipalities may not be sued under Section 1983 for punitive damages. *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3105–06 n. 14, 87 L.Ed.2d 114 (1985); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). But a county sheriff is not a municipal corporation, and the county of which the sheriff is an officer is not responsible for his torts, at least under State law, absent legislative assumption. N.Y. CONST., ART. XIII, § 13(a); *Bowman v. Campbell*, 193 A.D.2d 921, 597 N.Y.S.2d 772 (3d Dept.1993). Hence, the liability of a sheriff appears to be a novel question.

**29.** Since McCann was incarcerated pending trial, rather than serving a sentence, it is unclear that good time had any relevance to him. In any case, State law is clear that good time could be revoked only upon a finding of misconduct. N.Y.Correct.Law § 803 (McKinney 1987).