Michael F. RAMSEY, Plaintiff,

v.

Robert J. SQUIRES, Cpl. Maier, Andrew P. Meloni, John Lipari, Edward J. Frattare, Lt. Amico, Lt. Wren, Edward Krenzer, Sgt. Palma, Cpl. Callitri, Cpl. Fantigrossi, Paul Marre and Glen Smith, Defendants.

No. 91–CV–6352T.

United States District Court, W.D. New York.

March 3, 1995.

Michael F. Ramsey, plaintiff, pro se.

John Costello, Deputy County Atty., Rochester, NY, for defendants.

## DECISION AND ORDER

FISHER, United States Magistrate Judge.

Plaintiff, proceeding *pro se*, initiated this action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his constitutional rights when they confined him to administrative segregation without proper hearings from January 23, 1991 to February 12, 1991, and from March 1, 1991 to December 4, 1991, respectively. Plaintiff also has claimed that the periodic denial of his privileges during these periods deprived him of his constitutional rights.

This matter was originally referred to me by Chief Judge Michael A. Telesca, by order dated February 28, 1992, pursuant to 28 U.S.C. § 636(b)(1)(A). The parties subsequently executed a Consent to Proceed Before a United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). The consent was confirmed by order of Chief Judge Michael A. Telesca, dated December 3, 1992, pursuant to Fed.R.Civ.P. 73.

In a Decision and Order dated May 11, 1994 (Docket Entry # 69) I granted defendant's motion for summary judgment on plaintiff's First Amendment and Substantive Due Process claims. I denied without prejudice to renewal, the summary judgment motion on plaintiff's procedural due process claims, because defendants did not address these claims. Thereafter, in accordance with the timetable set forth in the aforementioned Decision and Order, defendants filed a motion for summary judgment on the procedural due process claims. Plaintiff submitted his affidavit in response to the motion on June 29, 1994. Plaintiff's procedural due process claims can be placed into three categories: unlawful placement in administrative segregation; unlawful use of administrative segregation as disciplinary confinement; and, unlawful continued confinement in administrative segregation. These claims are also directed at plaintiff's loss of privileges during administrative confinement. The following is my Decision and Order granting defendants' motion for summary judgment.

## I. *Facts and Background*

Plaintiff was incarcerated as a pretrial detainee at the Monroe County Jail on January 18, 1991, following his arrest and arraignment on serious felony charges filed by the Rochester Police, including attempted murder. He was continuously confined there until received by DOCS to serve sentences imposed upon his conviction for attempted murder and other felonies, including attempted escape from custody. His stay at the jail was stormy. On January 23, 1991, plaintiff attempted to escape from custody during an appearance for a preliminary hearing in the Rochester City Court on the attempted murder charges. The escape attempt occurred as plaintiff was escorted to a City Court courtroom (Part # 5). The plaintiff ran from the transport deputies, jumped the rail separating the bar from the general public, and was shortly apprehended, handcuffed, and returned to the City Court holding cell behind the courtroom.

A report was submitted by a Monroe County Sheriff's deputy requesting that plaintiff be placed in administrative segregation. This request was approved in writing by defendant Jail Superintendent Robert J. Squires ("Squires") and defendant Captain Edward J. Frattare ("Frattare"). On the same day, plaintiff was given written notice of the reasons for, and the special conditions attending, administrative confinement. Squires affidavit filed June 15, 1994 (docket entry # 74), at ¶ 8, Exhibit C. Plaintiff's behavior in administrative segregation was monitored on a weekly basis, and his privileges were gradually restored. He was released to the general population by February 12, 1991, 17 days later. But he was never given a formal administrative hearing in connection with the January 23rd escape attempt. Instead, criminal charges for escape were lodged in criminal court. Plaintiff was arraigned on them and entered a plea the next day. Plaintiff claims that he was not given a hearing or an opportunity to make a statement to the responsible prison officials concerning this administrative confinement, and that he had a constitutional right to have such a hearing. The record shows, however,

that he made a statement to the transport deputy, Jolly, when Jolly asked him why he tried to escape. According to Jolly's report, plaintiff said, "Did you see my charges. I had to try and escape, and I'll do it again if I get a chance." No formal hearing was held, however.

On March 1, 1991, jail officials learned from a "reliable source" that plaintiff was planning another escape. Plaintiff's cell was searched. This search turned up contraband, a circular piece of metal that jail officials believed could be used in an escape. Cpl. J. Maier filed a report of the discovery and requested that plaintiff be returned to administrative segregation, with the restriction that he be handcuffed whenever he left his cell. Maier's written report/request was reviewed by Sgt. Palma, who recorded on Maier's report that plaintiff was indeed a threat to security and that he was moved to administrative segregation at 1930 hours on March 1st. Later that day, plaintiff was notified of the contraband infraction and interviewed by Deputy Passe. Plaintiff explained that he was placed in a corridor cell after he came back from a visit, and when confronted with the discovery of contraband in his cell, said, "I don't know nothing about it." Report of Deputy Passe, attached as Exhibit A of the Reply Affirmation of T. Andrew Brown, Esq. (docket entry # 66). The interview occurred within 4½ hours of plaintiff's transfer to administrative segregation. The report states that plaintiff was confined to administrative segregation "pending a hearing." It appears, however, that plaintiff was not told of the investigation which yielded his plans for escape.

Plaintiff was given written notice of the handcuff restriction on March 4, 1991. Plaintiff was served with written notice of the contraband rule infraction and the scheduled hearing date on March 6, 1991. Squires Affidavit (docket entry # 74), at ¶ 12, Exhibit D. The "Notification of Infraction" told plaintiff that Cpl. Maier filed an infraction against him, charging him with possessing contraband in violation of the Inmate Rules

and Regulations. The notice also stated that it was "based on the written report attached," and that plaintiff would be given an opportunity to answer the "alleged infraction" at the hearing scheduled the next day, March 7, 1991. Unfortunately, the record does not reveal precisely what written report was attached to the notification. Cpl. Maier wrote up at least three reports in connection with the events of March 1, 1991. First, a "Report of Infraction" was prepared recording the discovery of contraband, plaintiff's statement to Deputy Passe, and the referral of the matter for a hearing. Brown affidavit (docket entry # 66) at Exh. A. Second, Maier prepared a two page "Special Report" dated March 1, 1991, to Sgts. Palma and Pereira detailing information from "reliable sources" tending to show that plaintiff was planning another escape attempt. Third, another two page "Special Report" to Sgt. Pereira was prepared on March 3rd detailing plaintiff's statements to another inmate, and conduct observed by the confidential "source" tending to confirm that plaintiff "is contemplating another attempt" to escape. Squires Affidavit (docket entry # 60), at Exh. H. The latter Report resulted in a handcuff restriction ordered on March 4, 1991. It is not clear which reports were attached to the notification of hearing delivered to plaintiff, but plaintiff claims that the escape issue never surfaced at the March 7th hearing, and defendants do not refute this. Plaintiff later learned of the special reports detailing his escape plans when defendants filed a response later that year to an Article 78 proceeding in State Supreme Court. It is therefore a fair inference—indeed there does not appear to be an issue of fact—that only the "Report of Infraction" concerning the contraband was attached to the March 6th notice.

Squires states in his affidavit that a hearing was held at 4:00 p.m. on March 7th, and that "Ramsey admitted both infractions." Squires Affidavit (docket entry # 74), at ¶ 13; Krenzer Affidavit of May 29, 1991, at ¶ 11.[1] Plaintiff does not affirmatively dispute that he admitted the infractions, but he points out that the escape issue never came up. The

---

1. Ramsey was also charged that day with not making up his bed routinely, in violation of Rule B and Housing Rule A.

hearing officer, defendant Deputy Edward L. Krenzer, recommended that plaintiff be given a verbal reprimand and continued administrative segregation. The recommendation was in writing and stated to be "Substantiated based on Written Report Given." Squires affidavit (docket entry # 74), at Exh. D. Again, the court presumes, that the Special Reports prepared by Maier on the escape issue were not presented to the hearing officer, because defendants do not allege otherwise.

Over the following three months, plaintiff was cited with more infractions which were sustained after hearings. Squires Affidavit ¶ 16 and Exh. E. Plaintiff makes no claim with regard to the constitutional sufficiency of these hearings under the due process clause. Instead, he contends that the charges were lodged against him as unlawful retaliation for his plans to escape, an issue defendants chose not to confront him with.

On June 1, 1991, while still confined to administrative segregation, plaintiff, with the assistance of two other inmates, attempted to escape once again. Deputy Danny Clark was escorting inmate Roy Timmons back to his cell when Timmons threw hot water in Clark's face. While Deputy Clark was temporarily blinded, Timmons took Clark's keys and opened his cell. Timmons then assaulted Clark. Clark's keys fell to the floor and were picked up by inmate Henry Newsome, who let himself and plaintiff out of their cells. While Timmons was fighting with Clark, and before Newsome let plaintiff out of his cell, plaintiff attempted to give Timmons a pen in order to stab Clark. After leaving their cells, the three inmates locked Clark into a cell.

The inmates began to break windows in aid of an escape from the facility. But they returned to the cell occupied by Deputy Clark and opened it. Clark grabbed Newsome and the keys, and then locked Newsome back in his cell. Next, Clark struggled with plaintiff, but managed to lock plaintiff back into his cell.

Clark was taken to the hospital. A team of deputies located and secured inmate Timmons. A shakedown of the third floor was conducted "to obtain any and all evidence of the escape attempt as well as any other contraband that may have been utilized or obtained during the escape attempt." Squires Affidavit ¶ 24 & Exh. I. According to defendants, this "escape attempt was the most serious escape attempt in the twenty-one year history of the Monroe County Jail since being located at the Public Safety Building, 130 Plymouth Avenue South, Rochester, New York[,] . . . [and] resulted in serious physical injury to Jail Deputy Daniel Clark . . . and in property damage in excess of $9,000." Squires Affidavit (docket entry # 60) ¶ 15 & Exh. J.

After the incident, plaintiff was continued in administrative segregation, and subjected to several restrictions. The next day, on June 2nd, Captain Frattare ordered, *inter alia*, that plaintiff be subject to a full handcuff restriction every time he was out of his cell and that he only be permitted non-contact visits. Further, the items plaintiff was permitted to have in his cell were restricted by order of Superintendent Squires dated June 4, 1991. *See id.* Exh. L. Plaintiff was served with written notice of the infraction on June 7, 1991. Plaintiff complained vigorously of the restrictions, in at least four memoranda, some written in crayon, to jail officials. Defendants responded to some of these memoranda, but not all.

The jail administration notified plaintiff of its intent to pursue criminal charges against him. Based on the pursuit of the criminal charges, the internal disciplinary proceedings were held in abeyance pending the outcome of the criminal charges. Squires Affidavit (docket entry # 74), at ¶ 20; *see also*, Notification of Intention to Pursue Criminal Charges, dated June 10, 1991, annexed to plaintiff's prior Motion for Summary Judgment (docket entry # 40). The record does not indicate whether these disciplinary hearings were ever held, but plaintiff was convicted of the escape charges and sentenced to state prison. He was removed to DOCS custody on December 4, 1991.

Although plaintiff was maintained in administrative segregation until December 4, 1991, he was periodically cited with additional rule infractions and received hearings on

those infractions (*see*, Squires Affidavit #2 ¶ 16, Exh. E and F). Plaintiff makes no claim with regard to the constitutional sufficiency of those subsequent hearings, but has preferred instead to characterize his continued confinement in administrative segregation as unlawful discipline or punishment for the escape attempt without a hearing addressed to the escape attempt. On the other hand, plaintiff also challenges the adequacy of process given him in connection with the June 1 escape attempt. Amended Complaint (docket entry #9) at ¶ 10, p. VII. *Soto v. Walker*, 44 F.3d 169, 174 (2d Cir.1995).

## II. *Standards on a Motion for Summary Judgment*

The rules applicable to summary judgment motions have been restated by the Supreme Court as follows.

> Rule 56(c) states that a party is entitled to summary judgment in his favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) further provides:

>> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

> As we stated in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d [265] (1986), "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S., at 322, 106 S.Ct., at 2552. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323, 106 S.Ct., at 2552.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990).

> Although the court must "assess the record in the light most favorable to the non-movant ..., [t]he non-movant, ..., who must sustain the ultimate burden of proof, must demonstrate in opposing a summary judgment motion that there is some evidence which would create a genuine issue of material fact." *Delaware & Hudson Railway Company v. Consolidated Rail Corporation*, 902 F.2d 174, 177–78 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

>> Conclusory allegations will not suffice to create a genuine issue. There must be more than a "scintilla of evidence," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252[, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202] (1986), and more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586[, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538] (1986).

*Id.* 902 F.2d at 178. *See, United National Insurance Co. v. Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir.1993) ("On a motion for summary judgment the court must pierce the pleadings and their adroit craftsmanship to get at the substance of the claim"); *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) ("where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim"); *Howard v. Gleason Corporation*, 901 F.2d 1154, 1159 (2d Cir.1990) ("summary judgment cannot be avoided by immaterial factual disputes"); *Fetterusso v. State of New York*, 898 F.2d 322, 328 (2d Cir.1990) (failure "to submit affidavits or indeed to point to any evidence").

Finally, in *pro se* cases, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *see also, Ruotolo v. Internal Revenue Service,* 28 F.3d 6, 8 (2d Cir.1994). When the *pro se* plaintiff is unaware of the requirement of Rule 56(e) that he or she must file affidavits which show a genuine issue of fact, it is inequitable, without a more explicit warning, to enter summary judgment against that plaintiff. *Graham v. Lewinski,* 848 F.2d at 344. In this case, plaintiff's knowledge of the requirements of Rule 56(e) is conclusively established by his timely response to this, and defendants' prior, summary judgment motion. Plaintiff was thus fully aware of his obligations under Rule 56.

### III. *Statement of Procedural Due Process Claims*

As recounted in the original Decision and Order (at pp. 11–16), plaintiff claims that, from January 23, 1991 to February 12, 1991, and from March 1, 1991 until December 4, 1991, respectively, he "was unlawfully confined to Administrative Segregation for Disciplinary reasons, in violation of ... 9 N.Y.C.R.R. 7006.1(b)(1), which prohibits use of Administrative Segregation for disciplinary purposes." Plaintiff's Affidavit in Opposition to the First Motion for Summary Judgment, at ¶ 6. In connection with these confinements, plaintiff claims that he was (1) not given notice of the charges against him; (2) not allowed to appear, call witnesses, or present documentary evidence at the disciplinary hearings; and (3) not given a written report of the hearing officer's findings. Plaintiff's Memorandum in Opposition to the Original Motion, at pp. 5–6. Lastly, plaintiff contends that he was "systematic[ally] deni[ed] ... all privileges without due process or regard to any laws." *Id.* at p. 10 (citing 9 N.Y.C.R.R. § 7006.1(c)(6)).

Plaintiff's claims are construed as alleging a denial of procedural due process in connection with his placement and maintenance in administrative segregation, and also in connection with the loss of privileges. Plaintiff's claim is that he did not receive the procedural protections to which he was entitled prior to imposition of administrative confinement and loss of privileges, not that (if he had received these procedural protections) the ultimate sanctions (or measures) ordered were not warranted. *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring) (in procedural due process, "the deprivation may be entirely legitimate—a state may have every right to discharge a teacher or punish a student—but the state may nevertheless violate the constitution by failing to provide appropriate procedural safeguards"); *Rowe v. DeBruyn,* 17 F.3d 1047, 1051 (7th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 508, 130 L.Ed.2d 416 (1994); *Dell'Orfano v. Romano,* 962 F.2d 199, 203 (2d Cir.1992) (same). Indeed, plaintiff concedes implicitly at least, that the restrictions ordered would have been warranted in light of his conduct if they had been implemented constitutionally.

As pointed out in the court's first decision, a claim of improper placement in administrative segregation must be distinguished from a claim of improper continuation or maintenance in administrative segregation. As the Second Circuit recently explained, the Fourteenth Amendment may not itself provide a substantive due process right to avoid strictly administrative segregation, *Wright v. Smith,* 21 F.3d 496, 498 (2d Cir.1994), but state law might create a protectible liberty interest in avoiding administrative segregation *placement* without sufficient process, *id.* 21 F.3d at 498–99, and the Fifth Amendment itself "arguabl[y]" might provide a due process right "in not being *kept* in restrictive confinement within a prison for an extended period of time without any hearing." *Id.* 21 F.3d at 499 (emphasis supplied).[2] *See also, Covino v. Vermont Department of Corrections,* 933 F.2d 128, 130 (2d Cir.1991) ("If no state law creates a liberty interest with respect to administrative segregation, then Co-

---

2. In consideration of the latter point, the court ultimately did "not rest decision on the Due Process Clause independently because New York has required, in mandatory terms, that no ad-ministrative segregation last more than 14 days without a hearing." *Wright v. Smith,* 21 F.3d at 500 (interpreting former 7 N.Y.C.R.R. § 304.3(c), applicable to state correctional facilities).

vino's initial confinement ... violated no protected constitutional right.... [but] [a]t some point, ..., the administrative necessity for involuntary lock-up begins to pale.... [and] after nine months, it smacks of punishment.")

The cases require this court to consider plaintiff's claim of procedural due process deprivation in light of the following questions: First, do the regulations applicable to pretrial detainees in the Monroe County Jail create a protectible liberty interest in avoiding *placement* in administrative segregation as do the regulations applicable to state facilities? *Covino v. Vermont Department of Corrections*, 933 F.2d at 129–30. *See also*, *Wright v. Coughlin*, 21 F.3d at 499; *Russell v. Scully*, 15 F.3d 219 (2d Cir.1993), *later opn. after remand*, 35 F.3d 55 (2d Cir.1994); *Matiyn v. Henderson*, 841 F.2d 31, 36 (2d Cir.1988), *cert. denied*, 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). Second, is plaintiff's claim of *continued confinement* in administrative segregation without a hearing cognizable as a liberty deprivation without due process of law, in light of the state regulations then applicable to county jails, i.e., former 9 N.Y.C.R.R. § 7006.1, or the Due Process Clause itself and *Wright v. Smith*, 21 F.3d at 499–500. *See Covino v. Vermont Department of Corrections*, 933 F.2d at 130 (plaintiff "is complaining, not merely of his initial move to the D–Wing, but, more importantly, of his continued confinement there for nine months").[3] On the latter point, the issue is whether former 9 N.Y.C.R.R. § 7006.1 is sufficiently akin to former 7 N.Y.C.R.R. § 304.3(c) (no administrative segregation in a state correctional facility may last more than 14 days without a hearing) that similar treatment is required. *See also*, *Gittens v. LeFevre*, 891 F.2d 38, 40 (2d Cir.1989) (holding that New York's keeplock regulations, 7 N.Y.C.R.R. § 251–1.b[a], create a liberty interest and are otherwise unconstitutional "because there is no provision for an inmate in keeplock to make any statement to the officer in charge of his confinement").

As a separate matter, and as pointed out in the court's first decision, the court must consider plaintiff's claim that his segregation was not merely administrative in character, but instead was disciplinary or punitive, or in retaliation for his escape attempts. In this regard, plaintiff claims not only that he was segregated from the general population, but also that he was deprived of a host of other "rights" and privileges. In *Russell v. Scully, supra,* for example, the court, on petition for rehearing, found that an administrative segregation was involved, but that the "loss of privileges was punitive." *Id.* 15 F.3d at 222. The court observed "that this deprivation of privileges *was designated* as punishment by Captain Wright." *Id.* (emphasis supplied). There was no indication whether the same finding would have been made without that designation. In this case, defendants have presented evidence on their renewed motion that the segregation and loss of privileges was purely administrative, that it was contemporaneously designated as such, and that the particular loss of privileges imposed on plaintiff was reasonably necessary to the concerns of security, as distinguished from punishment. Plaintiff's conclusory allegations to the contrary are without evidentiary force, particularly in view of the clear evidence that plaintiff's privileges were gradually restored after the January 23rd confinement in response to revised weekly security risk evaluations. *Hewitt v. Helms*, 459 U.S. 460, 477 n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983) (administrative review "is sufficient to dispel any motions that the confinement was a pretext"). Similar weekly review occurred after the March 1st administrative confinement, and no genuine question of fact exists that the restrictions plaintiff suffered were reasonably related to legitimate administrative concerns of the facility quite without regard to the fact that the escape attempts also constituted misconduct. *See* Part VII, *infra. Hewitt v. Helms*, 459 U.S. at 463 n. 1, 103 S.Ct. at 867 n. 1. In other words, this case is indeed distinguishable from *Russell v.*

---

**3.** 9 N.Y.C.R.R. § 7006.1 was replaced by 9 N.Y.C.R.R. § 7006.1–11, effective August 19, 1992. Title 9 applicable to local correctional facilities, instead of Title 7, which applies to state correctional facilities, governs in this case. *See* 9 N.Y.C.R.R. § 7000.1(b)(1); *see also* N.Y. Corr. Law §§ 40(2), 45(6).

*Scully*, 15 F.3d at 222, as the court pointed out in its first decision that it might be.[4]

Accordingly, I turn to the validity of the procedures employed by defendants to effect and continue the administrative detention of plaintiff, and then consider whether the qualified immunity defense is available to defendants. *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (requiring that a district court consider the merits of the underlying constitutional claim asserted as a "preliminary issue" in the overall qualified immunity inquiry); *Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir. 1992) ("The first step is to determine whether the alleged conduct violates any constitutionally protected right at all."); *Russell v. Coughlin*, 910 F.2d at 77 (same).[5]

## IV. *January 23rd Administrative Confinement*

Plaintiff claims that he was denied procedural due process with respect to his placement in administrative segregation on January 23, 1991. His claim also alleges wrongful continued confinement in administrative segregation. But in this section, it must first be determined whether plaintiff had a liberty interest in avoiding placement in administrative segregation.

The Fourteenth Amendment Due Process Clause does not independently create a liberty interest with respect to an inmate's placement in administrative segregation. *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983); *Wright v. Smith*, 21 F.3d 496, 498 (2d Cir.1994); *Russell v. Scully*, 15 F.3d 219, 221 (2d Cir. 1993). "In declining to accord independent constitutional protection to placement in ad-

ministrative segregation, *Helms* pointed out that this is the sort of confinement 'that inmates should reasonably anticipate receiving at some point in their incarceration.'" *Id.* 21 F.3d at 499 (quoting *Hewitt v. Helms*, 459 U.S. at 468, 103 S.Ct. at 870). *See Russell v. Scully*, 15 F.3d at 221. State law, however, may create a liberty interest in avoiding such placement and thus remaining within the general population. *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871; *Wright v. Smith*, 21 F.3d at 498; *Russell v. Coughlin*, 910 F.2d 75, 77 (2d Cir.1990).

The Supreme Court has found a liberty interest created when state law "has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed . . . and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance,'" *Hewitt v. Helms*, 459 U.S. at 471–72, 103 S.Ct. at 871. The reference to "procedures" in the above quoted language refers to "procedures that 'channel decision-making,' *i.e.,* that establish the substantive predicates for decision-makers' action." *Wright v. Smith*, 21 F.3d at 499. In other words, "[w]hat is clear is that a liberty interest is created whenever state law identifies 'specified *substantive* predicates' as prerequisites for the imposition of administrative segregation." *Wright v. Smith*, 21 F.3d at 498 (quoting *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871) (emphasis supplied in *Wright v. Smith*). *See also, Lowrance v. Achtyl*, 20 F.3d 529, 535–36 (2d Cir.1994); *Russell v. Coughlin*, 910 F.2d 75, 77 (2d Cir.1990); *Gittens v. LeFevre*, 891 F.2d 38,

---

4. Plaintiff's only support for the proposition that his confinement in administrative segregation was disciplinary in nature is the form notice on the Infraction Dispositions recording the hearing results. These recite in preprinted language: "The following disciplinary action is ordered: . . ." In each case, however, administrative segregation or "Continue Administrative Segregation" was typed in. Moreover, in correspondence with jail officials made a part of the record, plaintiff was assured that his confinement was administrative in nature and the reasons why. There is no genuine issue of fact on this question.

5. The merits of the claims asserted by plaintiff are considered first because "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). A district court "should not . . . assum[e] without deciding this preliminary issue." *Id.* 500 U.S. at 231, 111 S.Ct. at 1793. But compare *id.* 500 U.S. at 235, 111 S.Ct. at 1795 (Kennedy J., concurring).

40 (2d Cir.1989). *See also, Wright v. Smith,* 21 F.3d at 498

> For a liberty interest to be conferred by the state, two requirements must be met: (1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates. *See Kentucky Dep't. of Corrections v. Thompson,* 490 U.S. 454, 462–63[, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506] (1989); *Helms,* 459 U.S. at 466[, 103 S.Ct. at 868]; *Wright v. Smith,* 21 F.3d 496, 498 (2d Cir.1994); *Purnell v. Lord,* 952 F.2d 679, 684 (2d Cir.1992); *Gittens,* 891 F.2d at 40.

*Klos v. Haskell,* 48 F.3d 81, 90 (2d Cir.1995). The provision by the state of certain procedures do not, except to the extent they "channel decision-making," by themselves "establish the substantive predicates" for official action, or themselves create a liberty interest. *Olim v. Wakinekona,* 461 U.S. 238, 250–51 & n. 12, 103 S.Ct. 1741, 1748 & n. 12, 75 L.Ed.2d 813 (1983) ("expectation of receiving process is not, without more, a liberty interest"); *Wright v. Smith,* 21 F.3d at 498–99; *Villanova v. Abrams,* 972 F.2d 792, 798 (7th Cir.1992) (Posner, J.) ("persistent fallacy that procedural requirements create substantive entitlements") (providing illustrations of the point); *Fleury v. Clayton,* 847 F.2d 1229, 1231 (7th Cir.1988) (Easterbrook, J.) ("There is neither a 'liberty' nor a 'property' interest in procedures themselves, . . ."); *Schwartz v. Mayor's Committee on the Judiciary,* 816 F.2d 54, 57 (2d Cir.1987) (same); *BAM Historic District Association v. Koch,* 723 F.2d 233, 236–37 (2d Cir.1983) (Newman, J.) (same); *Pugliese v. Nelson,* 617 F.2d 916, 924 (2d Cir.1980) (same); *Cofone v. Manson,* 594 F.2d 934, 938 (2d Cir.1979) (same).

The substantive predicate in this case was provided by former 9 N.Y.C.R.R. § 7006.1(b)(3). That regulation specified that administrative segregation may not be "immediately" imposed unless "an employee has reasonable grounds to believe that the prisoner represents an immediate danger to himself or other persons or property[,] or constitutes a threat to the safety, security or order of the facility." *Id.* Imposition of or placement in administrative segregation was expressly limited to 24 hours and additional mandatory procedures were provided which prescribed alternative courses of administrative action which must be commenced within the 24 hour period. Former 9 N.Y.C.R.R. § 7006.1(b)(3)(i)–(iii). In the case of continued administrative segregation beyond 24 hours, the regulations required that only a written recommendation for continuation be made. *Id.* § 7006.1(b)(3)(iii).[6]

Although no circuit level (or higher) case specifically deals with § 7006.1(b)(3) formerly applicable to local jails in New York State,[7] the courts have held that similar regulatory language creates a state law created liberty interest in remaining free from administrative segregation. *Lowrance v. Achtyl,* 20 F.3d 529, 535–36 (2d Cir.1994) (describing *Gittens*—DOCS regulation "permitt[ing] administrative segregation of inmates only if the correction officer 'has reasonable grounds to believe that an inmate . . . represents an immediate threat to the safety, security or order of the facility'"—meaning when an officer reasonably believes a facility rule has been violated) (quoting 7 N.Y.C.R.R. § 251–1.6(a)); *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990) ("one substantive predicate upon which an inmate may be confined in keeplock is whenever an inmate represents a threat to the order of the facility"); *Gittens v. LeFevre,* 891 F.2d 38, 40 (2d Cir. 1989) (same). One reported district court case has held, on the authority of *Gittens,* that § 7006(b)(3) "plainly" created a liberty interest in remaining free from administra-

---

6. Thus, although this case would be like *Wright v. Smith, supra,* if a disciplinary report had been prepared, it is in reality nothing like that case, because of the peculiarly administrative nature of plaintiff's detention and the lack of any procedural guidelines other than the substantive predicate provided in the regulations, and the jail policy for weekly review, to guide jail officials.

7. As noted above, 9 N.Y.C.R.R. § 7006.1 was replaced by 9 N.Y.C.R.R. § 7006.1–11, effective August 19, 1992. Title 9 applicable to local correctional facilities, instead of Title 7, which applies to state correctional facilities, governs in this case. *See,* 9 N.Y.C.R.R. § 7000.1(b)(1); *see also,* N.Y. Corr. Law §§ 40(2), 45(6).

tive segregation in the local jails. *McCann v. Phillips,* 864 F.Supp. 330, 337 (S.D.N.Y. 1994). To summarize: The responsible prison official did not have unfettered discretion to impose administrative confinement under the regulation. *Compare Hall v. Unknown Named Agents,* 825 F.2d 642, 645–46 (2d Cir.1987); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). The regulation contained language of an "unmistakably mandatory character," *Hewitt v. Helms,* 459 U.S. at 471–72, 103 S.Ct. at 871, "requiring state officials to follow those substantive predicates." *Klos v. Haskell,* 48 F.3d at 90. And it insisted that the administrative confinement "may not" last more than 24 hours in the absence of additional mandatory procedures justifying continued confinement. The regulation formerly applicable to the Monroe County Jail thus created a liberty interest in avoiding placement in administrative confinement. *See, McCann v. Phillips,* 864 F.Supp. at 337; *Nolley v. County of Erie,* 776 F.Supp 715, 738 (W.D.N.Y.1991). *Cf. Baez v. Rapping,* 680 F.Supp 112, 115 (S.D.N.Y.1988) (former rule 9 N.Y.C.R.R. § 7006.1 creates a liberty interest for inmates confined to administrative segregation for more than 24 hours for disciplinary reasons).

■ No more process than was given plaintiff should have *preceded* his placement in administrative segregation. Indeed, the regulations then in effect permitted immediate administrative segregation without any more process than that a jail employee have reason to believe, and determine, that plaintiff was a threat to the security of the facility. It is significant that plaintiff's initial confinement occurred pursuant to a written request of the on-line transport deputy (Jolly) which was reviewed, and approved, by a Sergeant, Captain, and ultimately the Superintendent of the Jail, all on the same day. Written notice of the Superintendent's determination was given that day to plaintiff.

■ This is no more than was due at the initial placement stage. *Hewitt v. Helms* "declin[ed] to accord independent constitutional protection to placement in administrative segregation, ... [because] this is the sort of confinement 'that inmates should reasonably anticipate receiving at some point in their incarceration.'" *Wright v. Smith,* 21 F.3d at 499 (quoting *Hewitt v. Helms,* 459 U.S. at 468, 103 S.Ct. at 870). Thus, the initial placement of plaintiff in administrative segregation, while depriving plaintiff of a liberty interest, was not without due process of law. He had notice of what was happening to him and that is all that he could reasonably expect in the circumstances, even if he was innocent. In the absence of state law procedures providing otherwise, the initial placement decision, in a potentially volatile prison environment, may constitutionally be made immediately upon a determination by the custodian of the substantive predicate authorizing such placement. Federal law did not afford plaintiff any greater due process rights in connection with initial placement, and state law was fully complied with.

## V. *Liberty Interest in Avoiding Extended Confinement*

■ Plaintiff contends that due process required more than what was afforded him, and what the regulations provided for, immediately after his placement in administrative segregation. The regulations required only that the administrative segregation last no more than 24 hours and that, within that 24 hour period, one of three things happen, i.e., (1) release of the inmate accompanied by written notice of the release (which did not happen here), (2) preparation and service upon the inmate of a disciplinary report specifying, *inter alia,* the particulars of the inmate's behavior, and allowing the inmate to explain his behavior in a hearing to be held "without unnecessary delay" (which was not done), *or* (3) preparation of a written recommendation to the facility administrator "for administrative segregation" (which was done here). 9 N.Y.C.R.R. § 7006.1(b)(3)(i)–(iii); 9 N.Y.C.R.R. § 7006.1(c)(3), (5). In the case of the third alternative, recommendation for administrative segregation, the regulations were otherwise silent on what procedures should attend an inmate's continued confinement in administrative segregation beyond the initial 24 hour period. Monroe County Jail policies filled the void, however, *compare Nolley v. County of Erie,* 776 F.Supp. at 738–39, by providing, "The reasons for such ad-

ministrative segregation must be thoroughly documented and the placement reviewed for suitability by the Superintendent or his designee on a weekly basis." Monroe County Jail Bureau General Order JBGO 7–J–91, at Part IX(C), appended as Exh. I of Squires' Affidavit (docket entry # 74). The uncontradicted evidence was that plaintiff's case was reviewed as high as the Superintendent level on a weekly basis, every Monday, and that his privileges were gradually restored. Within 17 days, this review process resulted in plaintiff's release from administrative segregation.

It is undisputed that defendants did not afford plaintiff a formal hearing during those 17 days, but they did provide plaintiff with an opportunity to make a statement of explanation or mitigation on the day of placement.[8] As indicated, Deputy Jolly asked plaintiff shortly after the incident why he had attempted to escape. Plaintiff replied by fully admitting his conduct, by explaining that he acted because of the seriousness of his criminal charges, and by threatening to make another escape attempt if presented with the opportunity. Jolly's Sergeant, Keith Hyback, learned of plaintiff's statement in conversation with Jolly, and determined that he did not need to "go any further with my investigation in regards to talking with inmate, [d]ue to his present charges and now attempt to escape new charges." Hyback Report, at p. 2, Exh. E of Squires' Original Affidavit (docket entry # 60). Hyback evidently did speak with plaintiff, however, because he recorded in his report that plaintiff "did state to me that he had tried to escape back in 1983 from the same court room." *Id.* Hyback verified this, presumably with computer a record check, and noted it in his report. Plaintiff was arraigned the next day in Rochester City Court on escape charges and entered his plea.

 *Hewitt v. Helms* establishes that, in the absence of state prescribed procedures applicable to plaintiff's case, "due process in this context required 'some notice of the

charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation' within 'a reasonable time following an inmate's transfer.'" *Wright v. Smith,* 21 F.3d at 499–500 (quoting *Hewitt v. Helms,* 459 U.S. at 476 & n. 8, 103 S.Ct. at 873 & n. 8); *Santana v. Keane,* 949 F.2d 584, 585 (2d Cir.1991). If the state regulations do not provide for this minimal opportunity to be heard, they are unconstitutional on their face. For example, in *Gittens v. LeFevre,* 891 F.2d 38 (2d Cir. 1989), regulations not providing for an opportunity to be heard at any time in regard to keeplock, but only providing for daily review of the status of keeplock inmates, were held unconstitutional on their face because they did not provide the inmate with an informal opportunity to make a statement. *Id.* 891 F.2d at 41. Here, the regulations provided for no periodic review and no opportunity to be heard within a reasonable time on the question of placement or continued confinement in administrative segregation. They were unconstitutional. *Gittens v. LeFevre,* 891 F.2d at 41. *See also, Lowrance v. Achtyl,* 20 F.3d at 536 (*Gittens* held "that only a minimum of due process is due" in this context, but nonetheless, "the failure to afford the confined inmate an opportunity to make a written or oral statement to the officer in charge of his confinement rendered the New York scheme unconstitutional"); *Santana v. Keane,* 949 F.2d at 585 ("due process requires review within 'a reasonable time'" which "depends on the circumstances"); *Russell v. Coughlin,* 910 F.2d at 77–78 (*Helms* requires an opportunity to make a statement within a reasonable time of placement. Ten days is not reasonable unless explained by the need for more investigation or other "circumstances justifying their ten-day delay").

 Finding that the regulations in this case were unconstitutional, however, does not establish a violation of plaintiff's due process

---

8. Under the regulations, that would only be required if the disciplinary process was commenced pursuant to 7 N.Y.C.R.R. § 7006.1(b)(3)(ii) and § 7006.1(c). But the deputies' reports show that defendant made a state-ment, in which he admitted the escape and threatened to try again. Defendants evidently began the disciplinary process, but then aborted it in lieu of the pending criminal charges.

rights. It is important that, notwithstanding the regulations, the transport deputy, Jolly, gave plaintiff an opportunity to make a statement on the same day of his administrative confinement, that plaintiff did so, and that these were contemporaneously recorded in the written reports accompanying Deputy Jolly's request for administrative confinement ultimately reviewed and granted by the Superintendent. Plaintiff was given written notice of his new classification on the same day. Plaintiff's status was reviewed by the superintendent on a weekly basis, resulting in a gradual restoration of plaintiff's privileges and, ultimately, release from administrative confinement. Defendants also contend that the length of administrative confinement, here 17 days, and the decision to pursue criminal charges in connection with the January 23rd escape attempt, are factors militating against a finding that plaintiff's due process rights were infringed. They also contend that their actions fully comported with the regulations then extant in regard to administrative segregation in New York's local jails, and that no court decision had yet called into question the validity of the regulations they followed. *McCann v. Phillips*, 864 F.Supp. 330, 341 (S.D.N.Y.1994) (holding local jailer "personally liable seems unfair because the defect here really was a deficiency in the rules and regulations") (referring to § 7006.1(b)(3)).

These contentions bear in large part on the qualified immunity issue, but they also affect the decision concerning whether a constitutional right in regard to continued confinement was infringed in the first instance, as a close reading of the cases shows. The cases available to these defendants when they acted in 1991 held that, as a matter of federal constitutional law and in the absence of state law requirements to the contrary, defendants "were obligated to engage only in an informal" review process in connection with plaintiff's continued confinement, *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 872), and that "[t]his due process requirement may be satisfied by 'an informal, non-adversary review of the information supporting [the inmate's] administrative confinement, including whatever statement [the inmate] wishe[s] to submit, within a reasonable time after confining him to administrative segregation.'" *Gittens v. LeFevre*, 891 F.2d at 41 (quoting *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871) (bracketed material in original). *See also, Russell v. Coughlin*, 910 F.2d at 79. There was in 1991 no federal requirement of a separate and subsequent formal hearing in the absence of a state law requirement to the contrary, *see Lowrance v. Achtyl*, 20 F.3d at 536 (due process does not require officials to respond to inmate's statement); *Alston v. DeBruyn*, 13 F.3d 1036, 1042–43 n. 2 (7th Cir.1994),[9] and *Helms* makes clear that due process would have been satisfied by "some sort of periodic review of the confinement of such inmates" which need "not necessarily require that prison officials permit the submission of any additional evidence or statements." *Hewitt v. Helms*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. Each of these things happened in plaintiff's case. Accordingly, under the law in effect in 1991, no formal

---

**9.** The situation would be different if plaintiff raised a genuine issue of fact concerning whether his confinement in January and February was disciplinary or punitive in character. In such a case, state regulations provided for a more formal hearing, and in any event the due process clause required one in the disciplinary context. *Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974). The difference was recently recognized in *Soto v. Walker*, 44 F.3d 169, 172 (2d Cir.1995):

The requirement that a prisoner receive, in connection with an initial transfer to administrative segregation, at least some notice and opportunity to be heard is distinct from and in addition to the requirement that a prisoner receive, in connection with the adjudication of misconduct charges that might result in puni-

tive/disciplinary confinement, the much more extensive procedural protections that are set forth in *Wolff v. McDonnell*, 418 U.S. 539, 563–72[, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935] (1974), and which approximate a formal adversarial hearing. *See Hewitt*, 459 U.S. at 466–77[, 103 S.Ct. at 868–74]; *Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir.), *cert. denied*, 487 U.S. 1220[, 108 S.Ct. 2876, 101 L.Ed.2d 911] (1988); *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir.), *cert. denied*, 484 U.S. 896[, 108 S.Ct. 229, 98 L.Ed.2d 188] (1987). *Id. See also, Alston v. DeBruyn*, 13 F.3d 1036, 1042–43 n. 2 (7th Cir.1994). Here, the court is faced with an administrative confinement only, defendants having referred the matter to city court and the district attorney's office for criminal prosecution.

hearing was required after the January 23rd escape attempt. *Soto v. Walker*, 44 F.3d at 172 (2d Cir.1995) ("at the very least entitled to the procedures described in *Hewitt*"); *Alston v. DeBruyn*, 13 F.3d at 1042 (summarizing the *Helms* requirements).

The court recognizes that, "at some point in time" (to use the phrase in *Wright v. Smith*, 21 F.3d at 499), "the administrative necessity for involuntary lockup begins to pale" (*Covino v. Vermont Department of Corrections*, 933 F.2d at 130), such that the periodic review process envisioned by *Helms* might be found insufficient to protect an inmate's liberty interest in remaining free from extended confinement. That something more than the periodic review process would be necessary to justify extended administrative confinement was suggested for the first time in *Wright v. Smith*, 21 F.3d at 500, decided well after the events at issue in this case. But this is not a case to invoke such a rule. Defendants complied with the regulations, such as they were, plaintiff's rights under *Helms, Gittens, Russell, Santana, Soto*, and (especially) *Lowrance* were fully protected, a separate criminal proceeding was underway in City Court to determine if plaintiff should be punished, and plaintiff was released to the general population within a little over two weeks' time during which his privileges were gradually restored.

It is not clear that the result should be any different under the cases decided since defendants acted in 1991. Very recently, in *Green v. Bauvi*, 46 F.3d 189 (2d Cir.1995), the Second Circuit confirmed the holding in *Wright*. The court observed that, "when an inmate is segregated for an extended period of time for purposes other than disciplinary proceedings, he is entitled to a hearing, ... [citing *Wright v. Smith*, 21 F.3d at 499–500] and, ... [even before the scheduled hearing], an inmate must have 'some notice of the charges against him, and a minimal opportunity to present his views to prison officials.'" *Green v. Bauvi*, 46 F.3d at 194 (bracketed material supplied). The first part of the above quoted passage refers to a formal hearing, perhaps on the *Wolff* model, *cf. Soto v. Walker*, 44 F.3d at 172 n. 3, although no

case in this circuit yet describes what the necessary attributes of such a hearing would be, and the second part of the quoted passage refers to the familiar informal review process of *Helms* upheld in *Gittens, Russell, Santana* and *Lowrance*.

*Green* did not fix with any precision the timing of an inmate's right to the more formal hearing to be held in the continued administrative confinement context, because it ruled in favor of defendants on qualified immunity grounds without articulating how, or even explicitly whether, plaintiff's constitutional rights were infringed in the first instance. *Id.* 46 F.3d at 195–97. Similarly, in *Wright v. Smith*, the court's ultimate holding was somewhat less than precisely stated. That case, unlike this case, involved a liberty interest in avoiding continued administrative confinement which was, the court clearly implied, created in part by state procedural regulations that required a formal hearing within 14 days of initial confinement in administrative segregation. The court posited that, "notwithstanding *Helms*," the Due Process Clause of the Fourteenth Amendment might "requir[e] that *at some point in time*, confinement in administrative segregation cannot be perpetuated without a hearing." *Id.* 21 F.3d at 499 (emphasis supplied). Leaving that issue under the Due Process Clause open, however, the court found that the DOCS regulation requiring an administrative segregation hearing within 14 days created a liberty interest "at some point" in avoiding "extended" confinement without an adequate hearing. *Id.* 21 F.3d at 500. Unfortunately, the court attempted no further demarcation, even in view of the 14 day regulation, because it ultimately held: "Wherever that point might be placed as a purely constitutional requirement in the absence of state law requirements, there can be no doubt that when a state mandates such a hearing no later than 14 days after admission to the SHU [i.e., for administrative reasons] and a prisoner's confinement continues without a hearing for 67 days, a protected liberty interest [in avoiding extended or continued confinement] has been impaired." *Id.* 21 F.3d at 500 (bracketed material supplied).[10]

10. Viewing the situation as involving two separate liberty interests, one in avoiding placement

An entirely different set of procedural requirements are at issue in this case, and they evidently affect (under the reasoning of *Green* and *Wright* which this court must faithfully apply) the decision whether plaintiff's confinement for 17 days in administrative segregation without a formal hearing violated his due process rights. First, the administrative segregation in this case lasted only 17 days while plaintiff's privileges were gradually restored by the weekly review process envisioned by *Helms*. Second, and perhaps more important under the reasoning of *Wright*, there was in this case a complete "absence of state law requirements" (quoting *Wright v. Smith*, 21 F.3d at 500) in regard to a hearing on plaintiff's administrative segregation. 9 N.Y.C.R.R. § 7006.1(b)(3)(iii). Unlike *Wright v. Smith, supra,* and *Soto v. Walker, supra,* and the other DOCS cases in which the state regulations provided for a hearing within 14 or 7 days of placement in segregation, here the regulations made no provision for a hearing in a manner which themselves would "establish a substantive predicate" for extended administrative confinement, or otherwise would mix with the peculiar facts of the case as contemplated in *Wright* to permit a conclusion that a separate

in administrative segregation and another in avoiding extended confinement there, risks an analysis which might be characterized as a "mere tautology." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 543, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). Plaintiff had a liberty interest in remaining out of administrative segregation throughout his stay at the Monroe County jail which was, under the regulations, unitary. It had no separate components. He was entitled to be in the general population unless his jailors determined him to be a risk to the facility's security, and this entitlement went with him throughout his stay at the jail. The question at bar is really one of process only, that is what procedures are necessary under the due process clause to ensure that the substantive predicate for removal out of the general population was met in the first instance, and would continue to be met as his stay in segregation lengthened.

The court in *Wright* recognized the general rule that procedural requirements do not themselves create substantive entitlements, *Wright v. Smith*, 21 F.3d at 498, and that the DOCS regulation in that case was "not of the type of state law requirement that establishes a substantive predicate" sufficient to create a liberty interest in avoiding extended administrative confinement. *Id.* 21 F.3d at 500. But it held nevertheless that the 14 day requirement was also not a "mer[e] ... procedural detail incident to ... [administrative confinement] of the sort that is normally enforceable only in state court." *Id.* 21 F.3d at 500. In the absence of the overriding factor in *Wright* that the inmate suffered a 67 day administrative confinement without any process at all, one might well question why the 14 day requirement would be any more than a state law procedural detail quite beside the constitutional issue of what process is due in the extended administrative segregation context. The distinction was not explicated in a manner which gives guidance to district courts or provides any limiting principle suitable for application to other cases. *Cf. Cleveland Board of Education v. Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1493 (1985) ("the categories of substance and procedure are distinct.... 'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty.") New York might well have an interest in providing broader procedural protections than *Helms* requires without risking a federal court ruling that the regulatory procedures create a liberty interest in a hard case on the facts. *Olim v. Wakinekona*, 461 U.S. at 251, 103 S.Ct. at 1748 ("the State may choose to require protections for reasons other than protection against deprivation of substantive rights, of course, but in making· that choice the state does not create an independent substantive right."); *Wallace v. Robinson*, 940 F.2d 243, 248 (7th Cir.1991) (en banc) ("Using criteria of state law to define liberty that in turn activates the due process clause converts state entitlements into constitutional ones. Yet states have legitimate interests in freedom from federal oversight as they attempt to devise and implement their own rules."), *cert. denied*, 503 U.S. 961, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992). The Supreme Court has left open the issue whether, because of the interest of the state "to issue guidelines to prison staff to govern minor decisions, without thereby transforming the details of prison life into 'liberty interests' with accompanying procedural rights," prison regulations which do not affect duration or release from confinement can never create liberty interests. *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 461 n. 3, 109 S.Ct. 1904, 1909 n. 3, 104 L.Ed.2d 506 (1989). This case, of course, does not present that question today, because no such regulation as was at issue in *Wright* confronted defendants when they acted. But the lack of a limiting principle in *Wright* defining when a more formal hearing is necessary to supplement the *Helms* periodic review procedures provides difficulty in making rulings in concrete cases. As explicated in the text following, it is enough in this case to say that the key factor in *Wright*, of a 67 day segregation without any process directed to IPC status itself, is not present here in a way which mixes with state regulations in the manner described in *Wright* to create a separate liberty interest in avoiding administrative confinement extending over 17 days when the *Helms* procedures are faithfully followed.

liberty interest directed to extended confinement was impaired. Most important, however, and notwithstanding the regulations, plaintiff received the process caselaw said he was entitled to receive, viz., notice of administrative confinement (including its terms), an opportunity to make a statement in explanation or mitigation, and periodic review. When all of that, in fact, occurs, and state law does not prescribe as in the DOCS cases that a more formal hearing be held within a specific time (or at all), no case in this circuit holds that the failure to provide a formal hearing within 17 days, in the face of genuine weekly administrative review of plaintiff's status, *Hewitt v. Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9, denies an inmate his due process rights. *See also, Smith v. Shettle,* 946 F.2d 1250, 1254–55 (7th Cir.1991) (30 day periodic review of an "indefinite term" of administrative segregation may not, as a constitutional matter, be the "minimum frequency required"—a holding to the contrary "would be to legislate in the name of the Constitution at an excessive level of detail").[11] This court holds, on the present record, that plaintiff was not denied his constitutional rights in regard with the January 23rd through February 12th administrative confinement. It did not reasonably appear to defendants that "the administrative necessity for involuntary lockup [had] beg[u]n to pale," *Covino v. Vermont Dept. of Corrections,* 933 F.2d at 130, at least until plaintiff was released to the general population, and in such a case the *Helms* protections were minimally sufficient to protect plaintiff's due process rights. On these facts, the holding of *Wright* is not invoked.

 Even if the Constitution required such a formal hearing, akin perhaps to a disciplinary hearing, there was no clearly established caselaw available to defendants when they acted in 1991 alerting them of this. In each of the cases discussed above, it was determined that a state procedural regulation providing the time limits for, and the precise nature of, a disciplinary or other administrative confinement hearing defeated defendants' claim of qualified immunity. *E.g., Wright v. Smith,* 21 F.3d at 500 ("regulation itself gave the officials clear notice that confinement could not be continued beyond 14 days without a hearing"); *Russell v. Coughlin,* 910 F.2d at 79 (in view of the 7 day regulation, "it would have been unreasonable for defendants to believe that the . . . regulations were not sufficiently mandatory to create a protected liberty interest"). Thus in each of the relevant DOCS cases in this circuit cited above which denied qualified immunity, the regulations themselves negated defendants' argument that it was objectively reasonable for them to believe that their acts did not violate clearly established rights.[12]

In this case, no such regulation existed. No time limit for a formal hearing or its nature was prescribed, and the officials complied with Monroe County jail policy by providing weekly review of plaintiff's status in administrative confinement thus satisfying *Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. "Even if compliance with the state's

---

11. In *Smith v. Shettle,* it was assumed that the requirement of periodic review would be applicable only to inmates who "claim an *entitlement* not to be in segregation." *Id.* 946 F.2d at 1254 (emphasis in original). Plaintiff does not dispute, nor has he ever disputed, that he committed the January 23rd escape attempt, and therefore it is quite difficult to discern how he can legitimately claim an "entitlement" not to be in administrative segregation for those 17 days in the sense that "he should not be there in the circumstances," divorced from the entitlement he had as a constitutional matter to the determination that he was a security risk. But it is unnecessary, in view of the weekly review of status afforded him under *Helms,* to reach the question whether plaintiff sufficiently alerted his custodians during those 17 days of a claim that his confinement was improper, and whether if he did not, the periodic review process was constitutionally impelled under the circumstances.

12. This is not to say, of course, that the regulations conferred a federal due process right to a hearing within the specified period. The due process clause prescribes the procedures to be followed at a certain level of generality, not state law. *Cleveland Board of Education v. Loudermill,* 470 U.S. at 539–41, 105 S.Ct. at 1492–93. As stated above, procedural regulations do not "without more" create substantive entitlements. *Wright v. Smith,* 21 F.3d at 498–99; *Villanova v. Abrams,* 972 F.2d at 798. They simply, in the cases cited in the text, negated the qualified immunity defense.

own regulations is insufficient to meet the requirements of due process, adherence to such regulations may be pertinent in considering whether a reasonable official would have known his actions violated the Constitution." *Green v. Bauvi,* 46 F.3d at 195. Furthermore, although compliance with the regulations may not be enough if case law " '. . . marked the boundaries of . . . [plaintiff's rights to a more formal hearing] "with sufficient clarity to say that defendants' reliance on state law . . . was clearly in violation of . . . [plaintiff's right[,]" ' " *id.* 46 F.3d at 195 (quoting *Gittens v. LeFevre,* 891 F.2d at 42–43), "no case had clearly established what constitutes the minimum time within which a hearing must be held to determine whether an inmate *may be kept* in administrative confinement." *Id.* 46 F.3d at 195 (emphasis supplied). Nor had a case yet been decided that New York's local jail regulations, as opposed to DOCS regulations, were unconstitutional. Local jail officials in New York would not be expected to be on notice, through the administrative chain of command, of those cases dealing with DOCS regulations until the Commission on Correction notified them of the holdings or changed the regulations, as it later did, *supra* n. 3, applicable to local jails. *See generally,* N.Y. Corrections Law, Art. 3, practice commentary by William F. Pelgrin (10B McKinney's Consolidated Laws of New York Annotated, 1995 Supp. at 9–10) (describing the Commission's role *vis a vis* DOCS and the local jails). Accordingly, defendants would be entitled to qualified immunity even if due process required a more formal hearing, in addition to *Helms'* requirement of periodic review of status, within 17 days.

## VI. *March through June Administrative Confinement*

 Plaintiff was again confined to administrative segregation on March 1, 1991, after defendants became aware of another escape planned by plaintiff and after contraband was found in his cell. Therefore, plaintiff was entitled to notice of what was happening to him, an opportunity to present his view within a reasonable time to the officer responsible for such confinement, and periodic review unless the circumstances suggested that a more formal hearing justifying extended administrative confinement was necessary. *Hewitt v. Helms,* 459 U.S. at 472–73, 477 n. 9, 103 S.Ct. at 872, 874 n. 9; *Soto v. Walker,* 44 F.3d at 172; *Wright v. Smith,* 21 F.3d at 499–500; *Santana v. Keane,* 949 F.2d at 585; *Lowrance v. Achtyl,* 20 F.3d at 536; *Russell v. Coughlin,* 910 F.2d at 77; *Gittens v. LeFevre,* 891 F.2d at 40. The events of March 1st resulted in the preparation of a disciplinary report charging plaintiff with possession of contraband, a cylindrical object which might be used to effect an escape. On March 1, 1991, Cpl. J. Maier wrote a "special report" to his Sergeants requesting administrative segregation for plaintiff. A fellow inmate ("reliable source") told Maier that plaintiff was planning an escape. Details were provided concerning how plaintiff would escape, using a shower curtain rod. Maier's report revealed that the shower curtain rod foundations were found unscrewed. Plaintiff's cell was searched, yielding "a circular piece of metal believed to be the instrument used to remove and loosen the screws." Maier requested that plaintiff "be placed on administrative segregation status, so that his movement, and behavior can be monitored closely." Under the regulations then applicable to discipline, plaintiff was entitled to preparation of a disciplinary report within 24 hours of placement in administrative confinement, former 9 N.Y.C.R.R. § 7006.1(b)(3)(ii), and a disciplinary hearing was to be held "without unnecessary delay." 9 N.Y.C.R.R. § 7006.1(c)(5). The disciplinary report was prepared the same day.

The special report indicates that it was reviewed by Sgt. Palma and that plaintiff was moved to administrative segregation at 7:30 p.m. (1930 hours). Plaintiff was confronted in his cell with the disciplinary report charging him with contraband possession and was given an opportunity to make a statement less than 4 hours later at 11:20 p.m. Deputy Passe interviewed plaintiff. Plaintiff said that, when he came back from a visit, he was simply placed in a "corridor cell." Concerning the contraband, plaintiff stated, "I don't know nothing about it." It appears also that plaintiff complained to the Superintendent about the cell chosen for his administrative

confinement. In a memorandum dated March 3, 1991, plaintiff requested movement to a cell with a bed and table. A lieutenant responded in writing on March 5th, explaining that plaintiff's cell was the only one available, and that he would be moved "as soon as another ... [cell] becomes available." Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment, Exh. H. Defendants do not contend that plaintiff was confronted with the contents of the special report detailing his escape plans.

March 1st fell on a Friday. The special report and Sgt. Palma's disposition was not reviewed at a higher level until the following Monday, March 4, 1991, when Captain Frattare noted his approval and indicated that a letter was sent to plaintiff. The letter, sent in the form of a memorandum to plaintiff by Frattare, was dated March 4, 1991, and told plaintiff that he was under a handcuff restriction for any movement out of his cell. Meanwhile, Cpl. Maier conducted an additional investigation revealing that plaintiff had made a number of statements to other inmates which indicated an impending escape attempt. From Maier's March 3rd special report, it appeared that plaintiff and another inmate, Timothy Farrare, removed a junction box cover from the west side wall of the jail, and that Farrare admitted that he and Ramsey "were going to alter the cover into a weapon." It was this March 3rd special report that resulted in the handcuff restriction imposed by Capt. Frattare on March 4th. Plaintiff claims, and defendants do not refute, that he was not informed of Maier's special reports until the state answered an Article 78 proceeding in state court brought by plaintiff two months later in May of 1991.

On March 6th, plaintiff was served with an infraction notice, which informed him that a hearing on the contraband infraction was scheduled the next day. Sgt. Krenzer's affidavit in a subsequent state court Article 78 proceeding (sworn to May 29, 1991) showed that plaintiff received the notice of hearing between 12:45 p.m. and 1:15 p.m. on March 6th. Krenzer held the hearing "shortly after 4:00 p.m. on March 7, 1991." *Id.* at ¶ 10. Plaintiff admitted the contraband infraction and Krenzer "recommended a verbal repri-

mand and continued administrative segregation as sanctions." *Id.* at ¶ 11. The record does not reveal whether the hearing officer was confronted with or relied on Maier's special reports of plaintiff's escape plans. As in the January/February segregation, plaintiff's privileges were gradually restored until March 21st when he threatened staff members and was charged again with disorderly behavior. A catalog of plaintiff's transgressions through June 1, 1991, and thereafter, appears as Exh. H of Squires' affidavit (docket entry # 74). Disciplinary hearings were held on the indicated dates and plaintiff was found guilty of each resulting in continued administrative segregation and a verbal reprimand.

It appears from a document appended to plaintiff's original complaint (docket entry # 4) that plaintiff appealed the determination at the March 7th hearing concerning the March 1st discovery of contraband in his cell. In a memorandum to plaintiff from Superintendent Squires dated March 18, 1991, the appeal was denied. Plaintiff was also adjudicated guilty at the same hearing of a housing infraction in regard to the making of his bed. In his appeal, plaintiff complained that a disposition involving extended administrative confinement for such a minor transgression was inappropriate. Squires' response in his March 18th memorandum is reproduced in full:

> [I] tend to agree with your comments indicating that indefinite administrative segregation for failure to make your bed is disproportionate and shocking. However, the administrative segregation is in place as a result of a situation dealing with contraband which leads to a conclusion that your conduct may be a risk to safety, security and the good order, and therefore you will remain in your present status until it is determined your actions are not a risk.

Plaintiff's complaint (docket entry # 4), at Attachment B.

On this undisputed record, i.e., undisputed except by reference to plaintiff's conclusory assertions that his due process rights were violated, plaintiff received all of his *Helms* rights, and in addition received an adversary hearing in connection with the contraband

infraction which satisfied the *Wolff* standards. *Soto v. Walker*, 44 F.3d at 172 n. 3. Accordingly, whatever rights plaintiff may have had beyond *Helms, Green v. Bauvi*, 46 F.3d at 191; *Wright v. Smith*, 21 F.3d at 500, were satisfied by the more formal hearing held on March 7th, in which plaintiff admitted possessing contraband. Furthermore, whether or not plaintiff's admitted possession of contraband, in view of his earlier escape history, would have justified punitive detention, it is clear that plaintiff's case was reviewed periodically as *Helms* requires. Plaintiff does not contend otherwise. That a genuine *Helms* periodic review followed the March 1st incident is underscored by the gradual restoration to plaintiff of his privileges until new infractions were committed. These infractions resulted in hearings similar to those held on March 7th, and the findings (not challenged for accuracy by plaintiff) manifestly justified continued administrative segregation. *Wright v. Smith*, does not say how many formal hearings in regard to extended confinement are necessary over time, but it is clear that plaintiff received many. Over time, the necessity for administrative confinement never began "to pale." *Covino v. Vermont Department of Corrections*, 933 F.2d at 130.

Plaintiff also contends, in various points of his papers, that he did not learn of Maier's investigation of his escape plans until May of 1991, when defendants answered an Article 78 proceeding he brought in state Supreme Court. The failure to inform him of Maier's special reports, plaintiff now contends, rendered the March 7th hearing defective. Plaintiff reasons that the hearing officer based his decision on Maier's reports, not in plaintiff's admission at the hearing that he possessed contraband. Plaintiff offers no proof that the hearing officer based his decision on Maier's reports, but then defendants have submitted nothing on the issue whether indeed the hearing officer was informed of them. In view of the case law described below, however, the court concludes that this factual issue is not a genuine or material one precluding entry of summary judgment. It is assumed that the hearing officer, Krenzer, considered Maier's special reports together with the contraband infraction as a basis to impose the "Continued Administrative Segregation" order at the conclusion of the hearing.

The March 7th hearing was disciplinary in nature, until the remedy of continued administrative segregation was ordered. It has been suggested in the disciplinary hearing context that the requirement in *Wolff* of "a modicum of evidence to support a decision" of the disciplinary hearing officer *imposing discipline* implies that the hearing officer "should independently assess an informant's reliability if ... [he] relied upon that [confidential] information in a disciplinary hearing." *Richardson v. Selsky*, 5 F.3d 616, 622 (2d Cir.1993). Although no Second Circuit case provides definitive guidance on how that independent assessment should occur, *Russell v. Scully*, 15 F.3d at 223 ("there are presently no Supreme Court nor Second Circuit cases that clearly establish the procedures required to make an independent assessment of a [confidential] witness's credibility"), the Second Circuit has stated that "there must be some evidence in the record of the informant's reliability," *Richardson v. Selsky*, 5 F.3d at 624, and that "[o]ne means of satisfying this standard is for prison officials contemporaneously and independently to assess the credibility of the informants, and to create and preserve a record of that assessment ... for administrative or judicial review to insure that the conclusion reached by the prison disciplinary officials satisfies due process." *Id.* 5 F.3d at 624. *See also, Rasheed–Bey v. Duckworth*, 969 F.2d 357, 361–62 (7th Cir.1992). But these observations in *Richardson* are not yet the law of this circuit, because in *Russell v. Scully*, 15 F.3d 219 (2d Cir.1994) the court was careful to point out that "we do not regard that issue foreclosed in this circuit." *Id.* 15 F.3d at 223 (opn. on rehrg.).

No case called to the court's attention extends this rule to the administrative confinement context or even implies that the informal review process envisioned by *Hewitt v. Helms* contemplates an independent assessment of a prison informant's credibility before official action justifying removal to administrative segregation, either in the initial informal review stage or during the subse-

quent periodic reviews required by *Helms,* is completed. Indeed, two cases have implied that this rule would not be applicable to an inmate validly confined to administrative segregation, at least if that confinement did not impair a liberty interest. *Richardson v. Selsky,* 5 F.3d at 622; *Russell v. Scully,* 15 F.3d at 221 (opn. before rehrg.). This case is somewhat different, because plaintiff's confinement to administrative segregation on March 1st, though valid, quite clearly deprived him of a liberty interest in remaining within the general population. *See* above. But this case is not a case to announce the extension of a concept, formulated by other circuits in the *Wolff* context, to the *Helms* context, which has not as yet been established by this circuit in the *Wolff* context. *Russell v. Scully,* 15 F.3d at 223.

There are good reasons to doubt the efficacy of such a rule within the *Helms* formula. *Helms* did not require that the decision to remove an inmate to administrative segregation be supported by a "modicum" or other level of evidence, as did *Wolff.* The *Wolff* "modicum of evidence" requirement was the source of the independent credibility assessment rule urged upon the courts. Second, the goal of *Helms* was to ensure that administrative segregation not serve as a substitute, or be a pretext, for disciplinary confinement, and that the decision to remove an inmate to administrative segregation not be arbitrary or capricious. Formal *Wolff* hearings may well be incompatible with the types of procedures *Helms* found suitable for determining whether jailors improperly use administrative segregation for disciplinary purposes or whether they have met the substantive predicate of security risk justifying administrative segregation over time. If the state "set[s] forth criteria that limit the discretion of its prison officials to place inmates in administrative segregation[,] ... [the presence or absence of] these criteria can change through time, [making] some on going review ... necessary in order to determine whether they are still being met." *Smith v. Shettle,* 946 F.2d at 1254–55. An evaluation of the circumstances justifying continuing administrative detention is necessarily, under the *Helms* periodic review formula, on-going and dynamic, particularly if

the detention "is [of] an indefinite term, keyed to changing conditions," as it was in this case. *Id.* 946 F.2d at 1255. Prescribing precisely what the necessary content of the on-going review procedures should be is a task which might fairly be viewed, even if a liberty interest is affected, as "legislat[ing] in the name of the Constitution at an excessive level of detail," *id.* 946 F.2d at 1255, that which is properly left to the states within certain bounds. *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970) ("importance of not imposing upon the States ... any procedural requirements beyond those demanded by rudimentary due process"). *Cf. Villanova v. Abrams,* 972 F.2d at 798 (due process clause "leaves the details of the procedure for continuing evaluation of the committed person's condition to the states"). But the Second Circuit has held that "at some point" more than the periodic review process envisioned by *Helms* is necessary to justify continued administrative confinement. *Wright v. Smith,* 21 F.3d at 499–500. Because it has not yet specified what the necessary attributes of this additional process might be, except by reference to the word "hearing" as used in the state regulations at issue in *Wright,* it is not clear whether the *Wolff* model was what the court thought would be minimally necessary under *Wright.* Manifestly then, if it is not clear whether an independent-assessment-of-credibility rule applicable to prison informants will in this circuit ultimately be required in the disciplinary hearing context itself, *Russell v. Scully,* 15 F.3d at 223, it is wholly unclear whether that requirement would attend *Wright's* more formal process requirement in the extended administrative confinement context.

Fortunately, it is on the facts of this case unnecessary to resolve these questions, which in the first instance should be decided on a circuit court or higher level, even before analysis of the qualified immunity issue, so that district courts might have some guidance. *Siegert v. Gilley,* 500 U.S. at 231, 111 S.Ct. at 1793; *Mozzochi v. Borden,* 959 F.2d at 1179; *Russell v. Coughlin,* 910 F.2d at 77. For here, the record clearly shows that, if Krenzer considered Maier's reports on

March 7th, reliability was manifestly shown by the independent corroboration of the informant's story. This corroboration was provided by the contemporaneously recorded discovery of the unscrewed shower curtain rod, the contraband in plaintiff's cell, the fact that one of the inmate informants admitted participation in the escape conspiracy with plaintiff,[13] and the discovery of the partially removed junction box cover referred to by that inmate. If reliability of the informant is an issue in either the *Wolff* or *Helms* context, the record clearly shows that Krenzer could validly have made the required assessment upon an examination of Maier's contemporaneously made special reports alone. Accordingly, plaintiff's complaint insofar as it alleges a defect in the March 7th hearing is wholly without merit.

Accordingly, plaintiff's due process rights were not infringed during March through June of 1991.

### VII. *June 1, 1991 Escape Attempt and Aftermath*

■ Plaintiff's conduct on June 1, 1991, is detailed above and need not be repeated here. June 1st was a Saturday. It appears that plaintiff was notified of his privilege restrictions in a detailed June 2nd memorandum (he was already confined to administrative segregation), but it does not appear that he was ever given an opportunity to make a statement in mitigation or explanation, nor does it appear that an administrative hearing was ever held in connection with the June 1st escape attempt. Sgt. J. DiBuado's special report detailing the escape attempt states, "None of the inmates involved (Timmons, Newsome, or Ramsey) or any other inmates were interviewed by me regarding this matter due to pending criminal charges and an ongoing investigation by the CID unit." The loose pages plaintiff submitted to Chief Judge Telesca when he attempted to amend his complaint show, however, that plaintiff wrote (some with crayon) at least five memo/letters to jail officials in the days im-

mediately following the escape attempt complaining of his privilege restrictions. See Decision and Order dated September 16, 1991, recording the effort to submit loose pages (later plaintiff received permission to attach these pages to his amended complaint—see docket entries # 7 and # 8). Jail administrators responded to at least three of plaintiff's memoranda. He also wrote to the Chief Clerk of the Monroe County Supreme and County Courts on toilet paper complaining of his condition. The clerk responded to plaintiff by informing him that his "letter would be forwarded to [County Court] Judge [John] Connell," who was presiding over plaintiff's criminal matters. Two "Reports of Infraction" traditionally used in the disciplinary process were prepared, one for the escape attempt and one for the contraband. Each report, dated June 2nd, omits any reference to the inmate's plea. Plaintiff's cell was searched on June 2nd and contraband found.

Plaintiff was charged in the criminal courts with Escape in the First Degree and Assault in the Second Degree, and on June 7, 1991, was served with a "Notification to Pursue Criminal Charges" and an Infraction Report. The "Notification" alerted plaintiff of the Jail Bureau's intent to pursue the matter criminally. Sgt. Edward Krenzer explained in an affidavit sworn to November 4, 1991, filed in another state court Article 78 proceeding, that, "[p]ursuant to the standard Monroe County Sheriff's Office procedure, the disciplinary proceedings were and still are held in abeyance pending the outcome of the criminal charges at which point a decision would be made as to whether to pursue the disciplinary matters." Affidavit of Edward C. Krenzer, sworn to November 4, 1991 at ¶ 5 (submitted among the loose pages plaintiff subsequently submitted to the court after he attempted to amend his complaint). Defendants now maintain that "disciplinary hearings were held in abeyance pending the outcome of the criminal charges." Squires Affi-

---

**13.** Compare, in the Fourth Amendment context, *United States v. Gaviria,* 805 F.2d 1108, 1115 (2d Cir.1986) (confessed participation need not be shown to be previously reliable), *cert. denied,* 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531

(1987); *United States v. Miley,* 513 F.2d 1191, 1204 (2d Cir.1975) ("no informant in the usual sense"), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975).

davit (docket entry # 74), at ¶ 21. Plaintiff was eventually convicted of the escape attempt and sentenced to 2–4 years imprisonment. Weekly periodic reviews occurred as before, and plaintiff does not contend otherwise. In addition, twelve other disciplinary hearings were held between June 1st and December of 1991 when plaintiff was transferred to DOCS custody, each resulting in continued administrative segregation and a verbal reprimand.

Plaintiff's complaint (docket entry # 9) (at ¶ 10) is liberally read to allege a denial of a hearing in connection with the June 1st escape attempt. This claim is contained within a discrete claim that the denial of his privileges after the escape attempt was "done as punishment and in retaliation for actions allegedly taken by the plaintiff on the 1st day of June, 1991." *Id.* at ¶ 10, p. VII. But plaintiff added in the next sentence that he "was never given a hearing in regards to the charges for which he is being punished nor was plaintiff's rights or privileges limited or revoked as the result of a hearing disposition." *Id.* Under the rationale of *Soto v. Walker*, 44 F.3d at 173, this is "quite enough" to state a procedural due process claim concerning the June 1st escape attempt.

There was a disciplinary hearing held on June 7, 1991, in connection with an earlier charge of "threatening" jail personnel. Ramsey Affidavit (docket entry # 74) at Exh. F. *See also,* "Notification of Infraction" form dated June 3, 1991, scheduling a hearing on June 5, 1991, and reporting that the hearing was in fact held on June 7, 1991—Appended within Exhibit I of Plaintiff's Motion for Assignment of Counsel (docket entry # 18), and within Exhibit # 1 of Plaintiff's Notice of Motion for Summary Judgment (docket entry # 40). The disposition section of the form recites that the hearing was actually held on June 7th and that plaintiff was found guilty. A verbal reprimand and continued administrative segregation was ordered. *See also,* The Jail Log for June 7th:

> 1539 hrs: Disciplinary hearings conducted for (1) Ronald Corker, (2) Dennis Walker, and (3) Michael Ramsey ...
>
> 1540 hrs: Disciplinary hearing was given to Michael Ramsey C3, by Sgt. Krenzer.

Ramsey was placed in cuffs and shackles. The hearing was held in his cell with Deputies Scarpechi and Zimmerman present standing guard.—Cpl. Maier.

Response to plaintiff's Notice to Produce (docket entry # 27) at Exh. A. This hearing had nothing to do with the June 1st escape attempt. No defects are alleged in this or any of the other disciplinary hearings held between March and December of 1991.

On this record, plaintiff's primary claim that his administrative segregation was disciplinary/punitive instead of administrative in nature is beside the point. If plaintiff "would have been confined in administrative segregation regardless of any punitive motivation, he was not entitled to the heightened due process procedures associated with disciplinary confinement." *Matiyn v. Henderson,* 841 F.2d at 37. Because the record clearly shows that plaintiff got a *Wolff* hearing on June 7th in connection with the threatening charge and was found guilty, it is clear that continued administrative confinement in view of his pattern of behavior was supported by due process quite without regard to the escape attempt on June 1st. In other words, the decision to continue him in administrative confinement until his departure from the jail in December of 1991 came with the "heightened procedures" (*id.* 841 F.2d at 37) *Wright v. Smith* and *Green v. Bauvi* have since held may be applicable to situations of extended administrative confinement. Stated yet another way more consonant with the reasoning in *Matiyn v. Henderson,* 841 F.2d at 37, plaintiff does not raise a genuine issue of fact whether his continued administrative confinement after the escape attempt would not have been proper even in the absence of any motivation on the part of defendants derived from the escape attempt itself and the lack of the *Hewitt v. Helms* procedures. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Lowrance v. Achtyl,* 20 F.3d at 535; *Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984).

Even if plaintiff had presented such a question of fact in connection with the failure to afford the *Helms* procedures after

the June 1st escape attempt, however, it was reasonable in the circumstances for jail administrators to defer the matter pending resolution of the criminal charges, and to refrain from taking a statement from plaintiff. This case is unlike the typical case of a pending criminal investigation, which has been held not to excuse the *Helms* procedures, *Jones v. Manson*, 393 F.Supp. 1016, 1020–21 (D.Conn. 1975), because in this case there was the pendency of several prior criminal charges, including the January 23rd escape charges, and the peculiar New York right to counsel rules precluding law enforcement contact with a represented defendant. *See generally, People v. West*, 81 N.Y.2d 370, 599 N.Y.S.2d 484, 615 N.E.2d 968 (1993); *People v. Ruff*, 81 N.Y.2d 330, 599 N.Y.S.2d 221, 615 N.E.2d 611 (1993); *People v. Rogers*, 48 N.Y.2d 167, 422 N.Y.S.2d 18, 397 N.E.2d 709 (1979). Because plaintiff's attempted murder and January 23rd escape charges were pending before County Court Judge John Connell, and because plaintiff was represented by counsel on June 1st in connection with those pending criminal charges, New York law forbade law enforcement contact with plaintiff designed to elicit a statement from him, even on the new escape charge. *People v. Rogers, supra*, reaffirmed in *People v. West*, 81 N.Y.2d at 377–79, 599 N.Y.S.2d 484, 615 N.E.2d 968; *People v. Ruff*, 81 N.Y.2d at 333–34, 599 N.Y.S.2d 221, 615 N.E.2d 611. It is true that New York's right to counsel rule is only part of the exclusionary rule applicable to criminal cases, but there is authority in New York for the proposition that the *Rogers* exclusionary rule extends to evidence, including physical evidence, subsequently seized as a direct result of a confession suppressible under the *Rogers* rule on a fruit-of-the-poisonous-tree theory. *People v. Knapp*, 57 N.Y.2d 161, 174, 455 N.Y.S.2d 539, 441 N.E.2d 1057 (1982). Indeed, the regulations establishing use immunity procedures

in the prison disciplinary context provide that no statement made by an inmate in response to official action, "or information derived therefrom may be used against you in a criminal proceeding." 7 N.Y.C.R.R. § 251–3.1(d)(1). *People v. Nunez–Ramos*, 160 A.D.2d 1029, 1029–30, 554 N.Y.S.2d 947 (2d Dept.1990).[14] Moreover, the availability of use immunity in this context, *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Jones v. Manson*, 393 F.Supp. at 1021; *Fowler v. Vincent*, 366 F.Supp. 1224, 1227–28 (S.D.N.Y.1973); *Fowler v. Vincent*, 452 F.Supp. 449, 451–52 (S.D.N.Y.1978); *Carter v. McGinnis*, 351 F.Supp. 787, 793–95 (W.D.N.Y.1972), underscores the "derivative use" problem inherent in any decision to speak with plaintiff. *See Kastigar v. United States*, 406 U.S. 441, 449, 452–53, 92 S.Ct. 1653, 1659, 1660–61, 32 L.Ed.2d 212 (1972) ("use and derivative use"); *United States v. North*, 920 F.2d 940, 942 (D.C.Cir.1990); *United States v. Mariani*, 851 F.2d 595, 599–600 (2d Cir.1988) ("derived directly or indirectly"), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); *United States v. Harloff*, 807 F.Supp. 270, 281–83 (W.D.N.Y.1992). Therefore, defendants exercised understandable caution in not approaching plaintiff on June 1st because if they had done so the criminal investigation may well have been jeopardized and evidence discovered as a result of their talk with plaintiff would have been suppressible. Whether or not due process demands something more of jail administrators than simple deference to the criminal courts, a matter upon which only district court authority seems vaguely to resolve against the defendants, *Jones v. Manson*, 393 F.Supp. at 1020–21; *Carter v. McGinnis*, 351 F.Supp. 787, 793–95 (W.D.N.Y.1972), it was objectively reasonable for defendants to have believed in the context of New York law that any hearing on the

---

**14.** There does not appear to be a counterpart to the quoted DOCS regulation in 9 N.Y.C.R.R. Part 7006, but "by judicial construction ..., New York confers immunity coextensive with the privilege" against self-incrimination according to the familiar formula applicable to contexts such as this one. *United States v. Harloff*, 807 F.Supp. 270, 280–81 (W.D.N.Y.1992) (citing *Matter of Matt v. LaRocca*, 71 N.Y.2d 154, 159, 524 N.Y.S.2d 180, 518 N.E.2d 1172 (1987), *cert. de-*

*nied*, 486 U.S. 1007, 108 S.Ct. 1734, 100 L.Ed.2d 197 (1988)). New York's immunity statutes are otherwise transactional in nature. *Matter of Brockway v. Monroe*, 59 N.Y.2d 179, 189, 464 N.Y.S.2d 410, 451 N.E.2d 168 (1983). *See also, People v. Chapman*, 69 N.Y.2d 497, 516 N.Y.S.2d 159, 508 N.E.2d 894 (1987); *People v. Chin*, 67 N.Y.2d 22, 33 n. 4, 499 N.Y.S.2d 638, 490 N.E.2d 505 (1986).

June 1st escape attempt could await disposition of the criminal charges, particularly in light of the fact that administrative confinement was justifiable on grounds unrelated to the June 1st incident. *See Eggleton v. Gluch,* 717 F.Supp. 1230, 1235 (E.D.Mich. 1989), *aff'd. mem.* 916 F.2d 712 (6th Cir. 1990). *Cf. Green v. Bauvi,* 46 F.3d at 195–96.[15]

### VIII. *Loss of Privileges on June 2nd*

██ The Supreme Court has twice left open the question whether a simple "imposition of lesser *penalties* such as the loss of privileges" require the due process procedures provided in *Wolff. Baxter v. Palmigiano,* 425 U.S. 308, 323–24, 96 S.Ct. 1551, 1560–61, 47 L.Ed.2d 810 (1976) (emphasis supplied); *Wolff v. McDonnell,* 418 U.S. at 571 n. 19, 94 S.Ct. at 2982 n. 19. *See also, Vitek v. Jones,* 445 U.S. 480, 494, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980). The Second Circuit similarly has left the issue open. *McKinnon v. Patterson,* 568 F.2d 930, 937 n. 6 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Cunningham v. Ward,* 546 F.2d 481, 483 (2d Cir.1976) (per curiam); *Mawhinney v. Henderson,* 542 F.2d 1, 3–4 (2d Cir.1976). The question never has been definitively resolved in this circuit, *cf. Jermosen v. Smith,* 945 F.2d 547, 550–51 (2d Cir.1991), although one case has suggested otherwise without discussion. *Russell v. Scully,* 15 F.3d at 222 (opn. on rehrg.). The Eighth Circuit has held that imposition of the penalty of loss of privileges is not cognizable under the Due Process Clause. *Quam v. Minnehaha County Jail,* 821 F.2d 522, 522–23 (8th Cir.1987).

In this case, we are not faced with imposition of a lesser penalty in the sense of discipline or punishment. Nor are we faced with loss of privileges while housed in the general population, where the stigmatizing effect of such official action would be manifest. Instead, plaintiff was confined in administrative segregation and had several of his privileges restricted or restored on a weekly basis as the circumstances warranted. The loss of privileges occasioned by the June 2nd memorandum was, of course, the most restrictive of the Superintendent's orders during plaintiff's administrative confinement at the Monroe County Jail, but it was within the realm of measures inmates already confined to administrative segregation should naturally expect to receive from time to time if the circumstances warrant. *Cf. Hewitt v. Helms,* 459 U.S. at 468, 103 S.Ct. at 869–70 ("the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration," here in administrative segregation). Indeed, the administrative segregation ordered in *Hewitt v. Helms* was accompanied by a similar range of privilege restrictions applicable to an inmate who had been removed to administrative segregation and subjected to the privilege restrictions at the same time. *Id.* 459 U.S. at 467 n. 4, 103 S.Ct. at 869–70 n. 4. Accordingly, as in *Helms,* 459 U.S. at 466–68, 103 S.Ct. at 868–70, I hold that the privilege restrictions plaintiff suffered on June 2, 1991, after the second escape attempt and while he was already lawfully confined to administrative segregation, did not "involv[e] an interest independently protected by the Due Process Clause." *Id.* 459 U.S. at 468, 103 S.Ct. at 8760. *See also, Hall v. Unknown Agents,* 825 F.2d 642, 647 (2d Cir.1987); *Caldwell v. Miller,* 790 F.2d 589, 603–05 (7th Cir.1986).

██ The same analysis for determining whether state law confers on an inmate a liberty interest in avoiding administrative segregation applies to situations of lost privileges. *See, Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 462, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) (visitors); *Hernandez v. Coughlin,* 18 F.3d 133, 137 (2d Cir.1994) (conjugal visits), *cert. denied,* —— U.S. ——, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). The state regulation gov-

---

**15.** It is true that this defense also would have been available to defendants in connection with the January 23rd escape attempt, but plaintiff's statement on January 23rd came during a quite natural exchange with transport Deputy Jolly immediately after plaintiff was recaptured. When jail administrators became aware of the matter, administrative hearing procedures were deferred in favor of criminal prosecution as in the June 1st instance. There was therefore no real inconsistency in the way defendants handled each escape attempt which resulted in criminal charges.

erning the Monroe County Jail, former rule 9 N.Y.C.R.R. § 7006.1(b)(1), provides that an inmate in administrative segregation "shall have access to the same services and privileges" as inmates in the general population "unless restricted by the administrator of the facility for reasons dictated by the circumstances of each case ..." *Id.* The regulation prescribes no qualification of the jail superintendent's discretion to impose privilege restrictions attending an inmate's administrative confinement. Thus, with no substantive predicates or mandatory language to guide a jail administrator's decision in removing an inmate's privileges during administrative confinement other than that it may be ordered "for reasons dictated by the circumstances of each case," plaintiff had no liberty interest in retaining privileges possessed by the general population while in administrative confinement. *See, Sher v. Coughlin,* 739 F.2d at 81 ("unlimited discretion"); *Armstrong v. Lane,* 771 F.Supp. 943, 949 (C.D.Ill.1991) (where state regulations did not create a liberty interest for inmates in avoiding being handcuffed or restrained, the court deferred to prison officials' decision to handcuff inmates when outside of the cell).

 "Although the state may lawfully subject a pre-trial detainee to 'restrictions and conditions' 'to ensure his presence at trial,' 'those conditions and restrictions [cannot] amount to punishment, or otherwise violate the Constitution.'" *Covino v. Vermont Department of Corrections,* 933 F.2d at 130 (quoting *Bell v. Wolfish,* 441 U.S. 520, 536–37, 99 S.Ct. 1861, 1872–73, 60 L.Ed.2d 447 (1979)). Restrictions and conditions inside a prison are deemed administrative, as opposed to disciplinary, where prison officials demonstrate a compelling government interest in the restriction and the purpose of the measure is not solely punishment. *Hall v. Unknown Named Agents,* 825 F.2d at 647 (administrative segregation is forward looking and not retrospective); *Bolden v. Alston,* 810 F.2d 353, 357 n. 3 (2d Cir.1987) (discipline is imposed as punishment after adjudication of guilt); *Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("sole purpose ... is punishment"), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). Prison officials have legitimate concerns in managing the safety and security of their prisons. *Hewitt v. Helms,* 459 U.S. at 472, 103 S.Ct. at 872. Protecting against a threat to prison security by inmates attempting to escape is such a compelling government interest. *Patterson v. Coughlin,* 761 F.2d at 890; *Sher v. Coughlin,* 739 F.2d at 82.

 Defendants' confinement of plaintiff to administrative segregation, and accompanying suspension of privileges, was an administrative matter and not a disciplinary one. Accordingly, the loss of privileges on June 2nd did not affect plaintiff's rights under the Constitution. Defendants have demonstrated a compelling administrative justification for their actions, and there is no genuine issue of material fact in dispute on this point.

### CONCLUSION

Defendants' motion for summary judgment is granted for the reasons set forth more particularly above.

SO ORDERED.